**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO**

AES PUERTO RICO, L.P.,

    **Plaintiff,**

        **v.**               **Civil No.** 14-1767 (FAB)

MARCELO TRUJILLO-PANISSE, *et al.*,

    **Defendants.**

**OPINION AND ORDER**

BESOSA, District Judge.

    Two Puerto Rican municipalities passed ordinances restricting the use of ash derived from coal combustion within their territorial borders.  AES Puerto Rico, L.P. ("AES-PR"), a coal-fired power plant owner, filed suit against the municipalities to challenge the legality of the ordinances.  (Docket No. 1.)

    Currently before the Court are AES-PR's motion for partial summary judgment on its preemption claims, (Docket No. 29), which defendants oppose, (Docket No. 40), as well as AES-PR's unopposed requests for judicial notice, (Docket No. 32; Docket No. 49 at p. 9).  Also before the Court is defendants' motion for judgment on the pleadings on justiciability grounds, (Docket No. 37), which AES-PR opposes, (Docket No. 45).

    For the reasons below, the Court **GRANTS** AES-PR's requests for judicial notice, (Docket No. 32; Docket No. 49 at p. 9), **DENIES** defendants' motion for judgment on the pleadings, (Docket No. 37),

and **DENIES** AES-PR's motion for partial summary judgment, (Docket No. 29).

## BACKGROUND

Plaintiff AES-PR owns and operates a coal-fired power plant in Guayama, Puerto Rico (the "Guayama facility"). (Docket No. 31 at ¶ 2.) The Guayama facility imports coal from outside of Puerto Rico, primarily from Colombia, which it burns to generate electricity. (Docket No. 1 at ¶¶ 20, 25.) AES-PR sells this electricity to the Puerto Rico Electric Power Authority ("PREPA"). Id. at ¶¶ 22-23. Pursuant to its arrangement with PREPA, AES-PR satisfies approximately fifteen percent of Puerto Rico's total electric power needs. Id. at ¶ 21.

The combustion of coal produces two types of ashes: bottom ash and fly ash,[1] which are collectively referred to as coal combustion residuals ("CCRs"). (Docket No. 31 at ¶ 3.) When coal is burned at the Guayama facility, AES-PR collects the CCRs and transports them to storage silos on the premises. (Docket No. 1 at ¶ 26.) AES-PR produces approximately 200,000 to 250,000 tons of CCRs per year. Id. at ¶ 27.

---

[1] During the coal burning process, the larger particles fall to the bottom of the combustion chamber forming "bottom ash." (Docket No. 1 at ¶ 26.) The finer particles, called "fly ash," are captured with an electrostatic precipitator, a pollution-control device designed to capture particulate emissions before they enter the atmosphere. Id.

AES-PR uses the CCRs from the Guayama facility to produce coal combustion products ("CCPs"), including a manufactured aggregate product (sometimes referred to as "rock ash"), which AES-PR markets under the trade name AGREMAX™ ("Agremax").  See Docket No. 1 at ¶¶ 30-31; Docket No. 31 at ¶ 4.[2]  According to AES-PR, Agremax can be "beneficially used" in several ways.  (Docket No. 1 at ¶ 33.) For example, Agremax can be used in the construction industry as "structural fill" and for transportation projects as "subbase material" for roads.  Id. at ¶¶ 3, 33.  Agremax also has waste treatment applications: it can be used for liquid waste solidification and as "daily cover" for solid waste landfills, meaning Agremax (instead of natural materials like soil) is placed every day on top of the solid waste deposited in the landfill.  See id.; Docket No. 31 at ¶ 20.

AES-PR currently has contracts with landfills in Puerto Rico to provide Agremax for use as an alternative daily cover.  (Docket No. 31 at ¶ 20.)  For example, AES-PR has agreements with El Coqui Landfill Company LLC ("Coqui Waste"), Ecosystems, Inc. ("Ecosystems Waste"), and Peñuelas Valley Landfill Company, Inc. ("PV Waste") to provide CCPs - including Agremax - for beneficial use at El Coqui

---

[2]  Agremax is produced in a mill at the Guayama facility from a mixture of fly ash, bottom ash, and water.  See Docket No. 1 at ¶ 32.  The mixture is compressed and allowed to cure, during which time it hardens and forms into a manufactured aggregate.  Id.  The manufactured aggregate is further processed with heavy equipment and then stockpiled as inventory for subsequent beneficial use. Id.

Landfill (the "Coqui Landfill") in Humacao, Ecosystems Landfill in Peñuelas,[3] and Peñuelas Valley Landfill (the "PV Landfill") in Peñuelas, respectively.  See Docket No. 31 at ¶¶ 19, 21; Docket No. 51 at p. 3.

### The Ordinances

Two municipalities in Puerto Rico enacted ordinances restricting the use of coal ash within their territorial borders. These ordinances are the subject of this suit.  On April 10, 2013, the Municipality of Peñuelas adopted Ordinance Number 13, Series 2012-2013 (the "Peñuelas Ordinance"), which provides:

> The use of ashes coming from the burning of coal, in energy generating plants, *as landfill material and its depositing on lands* within the territorial limits of the Municipality of Peñuelas is forbidden.

(Docket No. 32-2 at p. 8, § 1 (emphasis added).)

On February 10, 2014, the Municipality of Humacao adopted Ordinance Number 21, Series 2013-2014 (the "Humacao Ordinance"), which provides:

> *Any kind* of use of the ash derived from coal combustion in electric power generating plants or any other industrial or commercial activity *as filler material, whether to level the terrain, for landfills, or in any other kind of filler*, is hereby prohibited within the territorial limits of the Autonomous Municipality of Humacao.

(Docket No. 32-1 at p. 9, § 1 (emphasis added).)

---

[3]  The Ecosystems Landfill in Peñuelas is currently under construction and is not yet operational.  See Docket No. 1 at ¶ 37.

Violators of either ordinance are subject to administrative fines up to $5,000.  Id. at p. 10, § 6; Docket No. 32-2 at p. 8, § 1.

Both Ordinances are aimed specifically at curbing AES-PR's use of coal ash.  They each discuss AES-PR's extensive use of coal ash on the island of Puerto Rico over the past few years, noting that coal ashes have been used in various municipal projects, from rural and agricultural lands to residential roads, and that in many of these places, coal ashes were deposited near aquifers.  See Docket No. 32-1 at p. 8; Docket No. 32-2 at p. 7.  They each express concern over the implications of this pervasive use, describing the findings of a 2010 study in which samples of CCR filler taken from the Parque Gabriela Development of Salinas showed high concentrations of carcinogenic and toxic metals, including arsenic and lead, and excessive radiation levels.[4]  See Docket No. 32-1 at p. 9; Docket No. 32-2 at p. 7.  Both Ordinances provide examples of possible damage to the environment and human health involving AES-PR's use of coal combustion byproducts in places outside of Puerto Rico, including Tennessee and the Dominican Republic.  See Docket No. 32-1 at p. 9; Docket No. 32-2 at p. 7.

_____

[4] According to this study, the alpha and beta radiation levels were up to three times the amount permitted by law.  See Docket No. 32-1 at p. 9; Docket No. 32-2 at p. 7.

**The Lawsuits in Commonwealth Court**

Since the enactment of the Ordinances, the Municipality of
Peñuelas and the Municipality of Humacao have each filed lawsuits
in Commonwealth Court against parties with which AES-PR has ongoing
contracts.  See Docket No. 49 at p. 9.  In August 2014, the
Municipality of Peñuelas brought suit against Ecosystems Waste
seeking to enjoin the use of Agremax in the construction of the
Ecosystems Landfill in Peñuelas.  (Docket No. 49-3.)  The Peñuelas
complaint alleges that Ecosystems Waste used Agremax in the
construction of the landfill's access road and, in doing so,
violated the Peñuelas Ordinance by "disposing of and/or depositing"
the filler material on the ground.  Id. at p. 4.  Similarly, in
October 2014, the Municipality of Humacao filed suit against Coqui
Waste seeking a permanent cease and desist order to prevent the
deposit of AES-PR's coal ash material in the Coqui Landfill.
(Docket No. 49-2.)

Shortly thereafter, AES-PR initiated this action.

**Procedural History**

On October 16, 2014, AES-PR filed suit in this Court against
the Municipality of Peñuelas, its Mayor, Walter Torres-Maldonado
("Mayor Torres") (collectively, the "Peñuelas defendants"), the
Municipality of Humacao, and its Mayor, Marcelo Trujillo-Panisse
("Mayor Trujillo") (collectively, the "Humacao defendants"),
challenging the municipal restrictions on CCRs in Peñuelas and

Humacao.  (Docket No. 1.)  Among other things, AES-PR contends that the Environmental Protection Agency (the "EPA"), pursuant to the Resource Conservation and Recovery Act, 42 U.S.C. §§ 6901 *et seq*. ("RCRA"), and Puerto Rico's Environmental Quality Board (the "EQB"), pursuant to parallel Commonwealth law, P.R. Laws Ann. tit. 12 §§ 8001 *et seq.*, authorize and encourage the beneficial use of CCRs.  See id. at pp. 11-15.  AES-PR contends that because the Ordinances conflict with this authority, the Ordinances violate the federal Supremacy Clause, are void and *ultra vires* under Puerto Rico law, and are preempted by Puerto Rico law.  See id. at ¶¶ 102-12 (federal preemption), ¶¶ 133-39 (void and *ultra vires*), ¶¶ 140-47 (state preemption).[5]  AES-PR requests injunctive and declaratory relief in addition to damages.  Id. at ¶ 6.

On January 2, 2015, defendants answered the complaint. (Docket No. 22.)  In their answer, they admit that the Humacao and Peñuelas Ordinances both "ban[] the use of ash resulting from the burning of coal anywhere within the territorial limits" of Humacao and Peñuelas.  Id. at ¶¶ 16, 21.

On May 15, 2015, AES-PR moved for summary judgment on its federal and state preemption claims.  (Docket No. 29.)

---

[5] The complaint also asserts claims pursuant to the federal Commerce Clause, (Docket No. 1 at ¶¶ 78-101); the Contracts Clause of the United States and Puerto Rico constitutions, id. at ¶¶ 113-121, 148-150; and the Due Process Clause of the United States and Puerto Rico constitutions, id. at ¶¶ 122-132, 151-153.

On May 26, 2015, defendants moved for judgment on the pleadings. (Docket No. 37.) Defendants argue that AES-PR lacks standing to challenge the legality of the Ordinances and that AES-PR's claims against the Peñuelas defendants are unripe and untimely. Id. AES-PR opposed defendants' motion. (Docket No. 45.)

On June 3, 2015, defendants opposed AES-PR's motion for partial summary judgment, (Docket No. 40), to which AES-PR replied on June 17, 2015. (Docket No. 49.) On June 30, 2015, AES-PR then filed a motion to supplement the summary judgment record and to request expedited consideration or hearing. (Docket No. 51.) AES-PR informed the Court that on June 26, 2015 the Peñuelas defendants, citing the Peñuelas Ordinance, "prevented the lawful delivery of [Agremax]" to the PV Landfill. Id. at p. 1.[6] On July 7, 2015, AES-PR filed a second motion to supplement the summary judgment record in order to submit a copy of an EQB resolution interpreting the PV Landfill's Operating Plan, (Docket No. 55), and defendants filed a response, (Docket No. 56.) The

---

[6] Specifically, AES-PR alleges that the Peñuelas defendants "blocked the public road to the PV Landfill entrance with vehicles, trucks, and heavy equipment bearing municipal license plates." (Docket No. 51 at p. 5.) During this time, a member of the Peñuelas municipal legislature, "inspected each truck to verify whether it contained Agremax" and "denied access to the PV Landfill to all trucks with cargo shipping documents indicating that the material carried was from AES-PR." Id. According to AES-PR, the municipal legislative member "stated she was acting at the direction of the Mayor of Peñuelas to enforce the Peñuelas Ordinance." Id.

following day, on July 8, 2015, the Court held a hearing to discuss
the events in Peñuelas and the issue of preemption.  (Docket
No. 57.)

### REQUEST FOR JUDICIAL NOTICE

AES-PR requests that the Court take judicial notice of various
documents attached as exhibits to its motion for partial summary
judgment.  (Docket No. 32.)  The documents include:  (1) the
Humacao Ordinance (Docket No. 32-1); (2) the Peñuelas Ordinance
(Docket No. 32-2); (3) the Puerto Rico Planning Board's May 1,
1996, Resolution (Docket No. 32-3); (4) the Guayama facility's
updated EQB Operating Permit (Docket No. 32-5); (5) the Coqui
Landfill's Operating and Contingency Plan for Nonhazardous Waste
(Docket No. 32-6); (6) the Coqui Landfill's EQB Permit to Operate
a Facility for Final Disposal of Non-Hazardous Solid Waste (Docket
No. 32-7); (7) the EQB's August 27, 2014, Resolution (Docket
No. 32-8); and (8) the EQB's March 26, 2015 letter to Coqui Waste
(Docket No. 32-9.)

In its reply brief, AES-PR also requests that the Court take
judicial notice of two complaints filed in the Commonwealth Courts.
See Docket No. 49 at p. 9.  AES-PR requests judicial notice of:
(1) the Humacao Complaint, Case No. HSC-120-1401009 (P.R. Super.
Ct. Oct. 2, 2014), (Docket No. 49-2); and (2) the Peñuelas
Complaint, Case No. JPE-2014-0457 (P.R. Super. Ct. Aug. 18, 2014),

(Docket No. 49-3).  Defendants do not challenge AES-PR's requests for judicial notice.

Federal Rule of Evidence 201 permits a court to take judicial notice of a fact "not subject to reasonable dispute" because the fact "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."  Fed. R. Evid. 201(b)(2).  Provided that their authenticity or accuracy is not disputed, documents contained in the public record, including the records and reports of administrative bodies, are proper subjects of judicial notice.  See, e.g., Torrens v. Lockheed Martin Servs. Grp., Inc., 396 F.3d 468, 473 (1st Cir. 2005) ("We are free ourselves to take judicial notice of the existence of government records."); United States v. 14.02 Acres of Land More or Less in Fresno Cnty., 547 F.3d 943, 955 (9th Cir. 2008) (finding judicial notice appropriate for records and reports of administrative bodies); Catholic League for Religious & Civil Rights v. City & Cnty. of S.F., 464 F. Supp. 2d 938, 941 (N.D. Cal. 2006) (taking judicial notice of city board of supervisors resolutions).  Similarly, documents on file in federal or state courts are proper subjects of judicial notice.  Harris v. Cnty. of Orange, 682 F.3d 1126, 1132 (9th Cir. 2012); see Global Network Commc'ns, Inc. v. City of New York, 458 F.3d 150, 157 (2d Cir. 2006) ("A court may take judicial notice of a document filed in another court not for the truth of the matters asserted in the other litigation, but

rather to establish the fact of such litigation and related filings.”); <u>MVM Inc. v. Rodriguez</u>, 568 F. Supp. 2d 158, 164 (D.P.R. 2008) (Besosa, J.) (permitting judicial notice of another court’s order as a fact that another proceeding took place).

Accordingly, the Court finds the above documents appropriate for judicial notice.  AES-PR’s requests for judicial notice, (Docket No. 32; Docket No. 49 at p. 9), are **GRANTED**.

### DEFENDANTS’ MOTION FOR JUDGMENT ON THE PLEADINGS[7]

Defendants seek a judgment on the pleadings, arguing that AES-PR lacks standing to challenge the legality of the Ordinances, that AES-PR’s claims against the Peñuelas defendants are unripe, and that AES-PR’s claims against the Peñuelas defendants are untimely. (Docket No. 37.)  Although styled as a “motion for judgment on the pleadings,” invoking Federal Rule of Civil Procedure 12(c), defendants’ motion embraces the legal standards governing Rule 12(b)(6).  <u>See</u> Docket No. 37 at pp. 2-5.  But because defendants in substance seek dismissal of the complaint on justiciability grounds, defendants’ motion is best understood as a motion to dismiss for lack of subject matter jurisdiction pursuant to

---

[7] Although defendants’ motion for judgment on the pleadings, (Docket No. 37), was filed after AES-PR’s motion for summary judgment, (Docket No. 29), the Court first considers defendants’ motion, which raises threshold issues regarding subject matter jurisdiction.  <u>See</u> <u>Pagan v. Calderon</u>, 448 F.3d 16, 26 (1st Cir. 2006) (“A federal court must satisfy itself as to its jurisdiction, including a plaintiff’s Article III standing to sue, before addressing his particular claims.”).

Rule 12(b)(1).  See, e.g., Valentin v. Hosp. Bella Vista, 254 F.3d 358, 362-63 (1st Cir. 2001) ("[Rule 12(b)(1) is a large umbrella, overspreading a variety of different types of challenges to subject-matter jurisdiction," including challenges "grounded in considerations of ripeness."); United Seniors Ass'n, Inc. v. Philip Morris USA, 500 F.3d 19, 23 (1st Cir. 2007) (finding defendants' standing arguments call into question the court's subject-matter jurisdiction).

When considering a Rule 12(b)(1) motion, the court must credit the plaintiff's well-pled factual allegations and draw all reasonable inferences in its favor.  See Valentin, 254 F.3d at 365. The reviewing court need not confine its jurisdictional inquiry to the pleadings, but may consider other materials.  See Gonzalez v. United States, 284 F.3d 281, 288 (1st Cir. 2002).  "The party invoking federal jurisdiction has the burden of establishing that it exists."  Mangual v. Rotger-Sabat, 317 F.3d 45, 56 (1st Cir. 2003).

## Standing

Defendants first contend that dismissal of the complaint is warranted because AES-PR lacks standing to challenge the legality of the Ordinances.  (Docket No. 37 at pp. 8-9.)  The doctrine of standing is rooted in Article III of the Constitution, which confines federal courts to the adjudication of actual cases and controversies.  See U.S. Const. art. III, § 2, cl. 1; Lujan v.

Defenders of Wildlife, 504 U.S. 555, 560 (1992) ("[T]he core component of standing is an essential and unchanging part of the case-or-controversy requirement of Article III."). An actual "case or controversy" exists when "the party seeking to invoke the court's jurisdiction (normally, the plaintiff) has a 'personal stake in the outcome' of the claim asserted." Pagan v. Calderon, 448 F.3d 16, 27 (1st Cir. 2006) (quoting Baker v. Carr, 369 U.S. 186, 204 (1962)).  To satisfy the personal stake requirement, "a plaintiff must establish each part of a familiar triad:  injury, causation, and redressability." Katz v. Pershing, LLC, 672 F.3d 64, 71 (1st Cir. 2012); accord Van Wagner Boston, LLC v. Davey, 770 F.3d 33, 36 (1st Cir. 2014) ("The 'irreducible constitutional minimum of standing' requires that the plaintiff has suffered an injury in fact, that this injury was caused by the conduct complained of, and that the relief sought is likely to redress the injury suffered."  (quoting Lujan, 504 U.S. at 560-61)).  The standing inquiry is claim-specific:  the reviewing court must determine whether "[the] plaintiff is entitled to have a federal

court adjudicate each particular claim that he asserts." Pagan, 448 F.3d at 26.[8]

In challenging AES-PR's standing, defendants only dispute the first element - that is, whether AES-PR sufficiently alleges an "injury in fact." See Docket No. 37 at pp. 8-9. Defendants argue that AES-PR, who is in the business of generating energy and selling CCPs, "is not in any imminent danger of being fined" because the Ordinances, which "do not prohibit the *sale* of CCPs," do not apply to AES-PR's business activities. Id. (emphasis added). Defendants thus contend that AES-PR suffers no "direct injury" as a result the Ordinances. Id. at p. 9.

In response, AES-PR contends that enforcement of the Ordinances impairs its ability to perform existing contracts with third parties to provide CCRs, including Agremax, for beneficial use in Humacao and Peñuelas. (Docket No. 45 at pp. 13-14.) AES-PR further argues that the Ordinances, which specifically target AES-PR and its Agremax, prevent AES-PR from entering into such contracts in the future. Id. at pp. 14-15. AES-PR points out that defendants have filed lawsuits in Puerto Rico courts against the

---

[8] In addition to these Article III prerequisites, prudential concerns ordinarily require a plaintiff to show: (1) that its claim is premised on its own legal rights (as opposed to those of a third party); (2) that its claim is not merely a generalized grievance; and (3) that its claim falls within the zone of interests protected by the law invoked. See Pagan, 448 F.3d at 27. Defendants raise no issue as to these prudential considerations, which in any event, "are not as inexorable as their Article III counterparts." See id.

parties with which AES-PR contracts seeking to enjoin the use of
Agremax in their respective jurisdictions.  Id. at p. 10.

To satisfy the "injury in fact" element, a plaintiff must
adequately allege "an invasion of a legally protected interest,"
Lujan, 504 U.S. at 560, that is "concrete and particularized," on
one hand, and "actual or imminent (as opposed to conjectural or
hypothetical)," on the other, Pagan, 448 F.3d at 27.  In this case,
AES-PR suffers injury because it wants to distribute its Agremax
product to landfills in Humacao and Peñuelas but is "constrained
from doing so by the strictures of the Ordinance[s]."  See Merit
Const. Alliance v. City of Quincy, 759 F.3d 122, 127 (1st Cir.
2014).  The alleged injury is particularized - the Ordinances are
expressly aimed at curtaining the use of AES-PR's aggregate product
- and non-hypothetical - in practice, through litigation and other
methods, defendants have relied upon the Ordinances to prevent
landfills in Humacao and Peñuelas from receiving Agremax, burdening
AES-PR's existing contractual arrangements with those landfills.

With respect to the Peñuelas Ordinance, which has since been
enforced against AES-PR, the injury to AES-PR is particularly
clear.  The record reveals that on June 26, 2015, approximately one
month after defendants moved for dismissal, the Peñuelas
defendants, allegedly citing the Peñuelas Ordinance, prevented
AES-PR from delivering Agremax to the PV Landfill.  See Docket
No. 51.  AES-PR maintains that, as a result, it was unable to

fulfill its contract with PV Waste, which contemplates the
provision of Agremax for use as daily cover to the PV Landfill.
See id. at pp. 6-7.  In addition to the sunk costs attendant to
hiring truckers to deliver CCRs to the PV Landfill unsuccessfully,
AES-PR claims that it will incur additional costs and hardship to
dispose of its CCRs properly.  Id. at pp. 7-8.  "It is a bedrock
proposition that 'a relatively small economic loss—even an
identifiable trifle—is enough to confer standing." Katz, 672 F.3d
at 76 (quoting Adams v. Watson, 10 F.3d 915, 924 (1st Cir. 1993)).
The enforcement of the Peñuelas Ordinance against AES-PR thus
constitutes a direct harm to AES-PR's economic interests sufficient
to confer standing.

     In sum, the Court finds that AES-PR adequately pleads an
injury sufficient to confer standing.

### Ripeness

     Defendants also argue that AES-PR's claims against the
Peñuelas defendants are not ripe.  (Docket No. 37 at pp. 10-14.)
The ripeness and standing inquiries generally overlap.  See
McInnis-Misenor v. Maine Med. Ctr., 319 F.3d 63, 69 (1st Cir.
2003).  Like standing, the ripeness doctrine "has roots in both the
Article III case or controversy requirement and in prudential
considerations." Manqual, 317 F.3d at 59.  "Whereas standing asks
'who' may bring a claim, ripeness concerns 'when' a claim may be
brought." Nulankeyutmonen Nkihtaqmikon v. Impson, 503 F.3d 18, 32

(1st Cir. 2007).  The ripeness doctrine protects against "premature
adjudication" so that courts do not "entangl[e] themselves in
abstract disagreements." Roman Catholic Bishop of Springfield v.
City of Springfield, 724 F.3d 78, 89 (1st Cir. 2013) (quoting
Abbott Labs. v. Gardner, 387 U.S. 136, 148 (1967)).

     In analyzing ripeness, courts ask whether "there is a
substantial controversy, between parties having adverse legal
interests, of sufficient immediacy and reality to warrant the
issuance of a declaratory judgment." McInnis-Misenor, 319 F.3d
at 70 (quoting Lake Carriers' Ass'n v. MacMullan, 406 U.S. 498, 506
(1972)).  This determination ordinarily involves a formalistic
evaluation of (1) the fitness of the issues for judicial decision,
and (2) the hardship to the parties of withholding court
consideration. Id.  The "fitness" inquiry concerns "whether the
necessary factual predicate is sufficiently matured to allow a
court to resolve the issue presented." Gastronomical Workers Union
Local 610 & Metro. Hotel Ass'n Pension Fund v. Dorado Beach Hotel
Corp., 617 F.3d 54, 61 (1st Cir. 2010); see also Ernst & Young v.
Depositors Econ. Prot. Corp., 45 F.3d 530, 536 (1st Cir. 1995)
("[T]he critical question concerning fitness for review is whether
the claim involves uncertain and contingent events that may not
occur as anticipated or may not occur at all." (quoting
Massachusetts Ass'n of Afro-American Police, Inc. v. Boston Police
Dep't, 973 F.2d 18, 20 (1st Cir. 1992))).  The "hardship" inquiry

asks whether the challenged action creates a "direct and immediate dilemma" for the parties.  Id.

Defendants argue that judicial intervention as to the Peñuelas Ordinance is premature because the Ecosystems Landfill in Peñuelas, where AES-PR alleges that Agremax will be used, is still under construction and is thus neither permitted nor operational.  See Docket No. 37 at pp. 10-14.  Defendants argue that AES-PR is requesting a remedy based on a "hypothetical scenario that the Ecosystems Landfill in Peñuelas will obtain a permit from the EQB." Id. at p. 14.  Even assuming that the Peñuelas Ordinance is not yet applicable to the pre-operational Ecosystems Landfill,[9] it is undisputed that the Peñuelas Ordinance has been applied to prevent AES-PR from delivering Agremax to the PV Landfill in Peñuelas.  See Docket No. 51.[10]  This blockade allegedly hindered AES-PR's ability to fulfill its contract with PV Waste.  See id. at pp. 6-7.

The Court finds that the claims against the Peñuelas defendants are ripe.  Because the basis of defendants' ripeness challenge was the lack of enforcement of a law that has since been

---

[9]  That the Municipality of Peñuelas has, on the basis of the Peñuelas Ordinance, sought to enjoin the use of Agremax at the Ecosystems Landfill belies defendants' contention that the Ecosystems Landfill's lack of permits renders judicial intervention premature.  See Docket No. 45 at p. 12; Docket No. 45-1.

[10]  AES-PR's motion to supplement the summary judgment record provides the facts surrounding the enforcement of the Peñuelas Ordinance at the PV Landfill on June 26, 2015.  See Docket No. 51. A court may look beyond the pleadings to assess the ripeness of the plaintiff's claim.  See Valentin, 254 F.3d at 363-64.

enforced, the Court need not belabor the analysis.  AES-PR's claims against the Peñuelas defendants involve non-hypothetical acts, so the controversy is fit for adjudication.  The application of the Peñuelas Ordinance has already financially harmed AES-PR, whose existing contracts languish due to regulatory constraints, and withholding judicial review would serve only to delay the vindication of that injury.  See Gastronomical Workers, 617 F.3d at 61.

Thus, the claims against the Peñuelas defendants are ripe for adjudication.

## Timeliness

Finally, defendants argue that AES-PR's claims against the Peñuelas defendants are not timely.  (Docket No. 37 at pp. 15-16.) Defendants correctly assert that in Puerto Rico, the statute of limitations for claims brought pursuant to 42 U.S.C. § 1983 is one year.  See id. at p. 15; Morales-Tañon v. P.R. Elec. Power Auth., 524 F.3d 15, 18 (1st Cir. 2008).  Because the Peñuelas Ordinance was enacted on April 10, 2013, more than one year before AES-PR filed the complaint on October 16, 2014, defendants argue that the claims against the Peñuelas defendants should be dismissed as time-barred.  (Docket No. 37 at pp. 15-16.)

In opposition, AES-PR contends, among other things, that the statute-of-limitations clock began to run upon enforcement, not enactment, of the Peñuelas Ordinance.  See Docket No. 45 at pp. 19-

22. According to AES-PR, the limitations period was not triggered until "the Peñuelas defendants sought to enforce the [Peñuelas] Ordinance to preclude the use of AES-PR's CCRs at the Ecosystems Landfill." Id. at p. 20.  Specifically, AES-PR refers to the suit that the Peñuelas defendants filed against Ecosystems Waste on August 18, 2014, which sought to enjoin the use of Agremax at the construction-phase Ecosystems Landfill.  See id.

Federal law, which governs the date of accrual for a section 1983 action, provides that the limitations period begins to run when the party knows or should know of the injury on which the action is based.  See Asociacion de Suscripcion Conjunta del Seguro de Responsabilidad Obligatorio v. Juarbe-Jimenez, 659 F.3d 42, 50 (1st Cir. 2011); see also Gilbert v. City of Cambridge, 932 F.2d 51, 57 (1st Cir. 1991) ("The limitation period begins to run upon the invasion of the plaintiffs' interests.").  In determining the date of accrual, courts first identify the actual injury on which the plaintiff rests the cause of action.  See, e.g., Marrero-Gutierrez v. Molina, 491 F.3d 1, 5 (1st Cir. 2007).

Here, the injury of which AES-PR complains centers on the application of the Ordinances to landfills with which AES-PR contracts.  In Peñuelas, the restriction on AES-PR's CCRs did not occur until at least August 18, 2014, when the Municipality filed suit against Ecosystems Waste.  Defendants provide no reason to believe that AES-PR knew or should have known of the facts

constituting the violations of its rights any sooner.  Because AES-PR filed suit on October 16, 2014, (Docket No. 1), within two months of the invasion of its interests, AES-PR's claims against the Peñuelas defendants are timely.

In sum, for these reasons, defendants' motion to dismiss, (Docket No. 37), is **DENIED**.

### AES-PR'S MOTION FOR SUMMARY JUDGMENT

AES-PR moves for summary judgment on its federal and state preemption claims.  (Docket No. 29.)  A court will grant summary judgment if the moving party shows, based on the materials in the record, "that there is no genuine dispute as to any material fact and [it] is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A fact is "material" if it potentially affects the outcome of the case.  Calero-Cerezo v. U.S. Dep't of Justice, 355 F.3d 6, 19 (1st Cir. 2004).  A factual dispute is "genuine" if its resolution could favor either party at trial.  Id.  At the summary judgment stage, a court must construe the entire record in a light most hospitable to the nonmoving party and draw all reasonable inferences in its favor.  DePoutot v. Raffaelly, 424 F.3d 112, 117 (1st Cir. 2005).

### Federal Preemption

A federal preemption inquiry begins with the Supremacy Clause, which requires that federal law be "the supreme Law of the Land." U.S. Const., Art VI, cl. 2.  "Any state law that contravenes a

federal law is null and void." <u>Tobin v. Fed. Exp. Corp.</u>, 775 F.3d
448, 452 (1st Cir. 2014).[11]  Pursuant to this principle, "Congress
has the power to preempt state law." <u>Arizona v. United States</u>, 132
S. Ct. 2492, 2500 (2012).  To determine the preemptive effect of a
federal law, courts look to the intent of Congress.  <u>Antilles</u>
<u>Cement Corp. v. Fortuño</u>, 670 F.3d 310, 323 (1st Cir. 2012); <u>Grant's</u>
<u>Dairy-Me., LLC v. Comm'r of Me. Dep't of Agric., Food & Rural Res.</u>,
232 F.3d 8, 14 (1st Cir. 2000) ("Congressional intent is the
touchstone of preemption analysis.").

     Federal law may preempt state law either "expressly or by
implication." <u>Grant's Dairy</u>, 232 F.3d at 15.  "Express preemption"
occurs when "a federal statute explicitly confirms Congress's
intention to preempt state law." <u>Id.</u>  In the absence of an express
preemption provision, courts look to "the structure and purpose of
the statute" to determine whether Congress intended preemption to
occur.  <u>Antilles</u>, 670 F.3d at 323.  "Implied preemption" takes two
forms:  "field preemption" and "conflict preemption." <u>Grant's</u>
<u>Dairy</u>, 232 F.3d at 15.  "Field preemption" occurs when Congress
creates a federal regulatory scheme that is "so pervasive" as to
evidence its intent to occupy the regulated field without state
supplementation.  <u>See id.</u> "Conflict preemption" occurs either when

---

[11] For purposes of the Supremacy Clause, "the laws of Puerto Rico
are the functional equivalent of state laws," <u>Antilles</u>, 670 F.3d
at 323, and "the constitutionality of local ordinances is analyzed
in the same way as that of statewide laws," <u>Hillsborough Cnty. v.</u>
<u>Automated Med. Lab., Inc.</u>, 471 U.S. 707, 713 (1985).

"compliance with both state and federal regulations is impossible" or when "state law interposes an obstacle to the achievement of Congress's discernible objectives." Id.

Preemption is a "strong medicine," that is "not casually to be dispensed." Id. at 18. A presumption against preemption applies, particularly in cases where Congress has legislated in a field which the states have traditionally occupied. Rice v. Santa Fe Elevator Corp., 331 U.S. 218, 230 (1947). In those cases, courts "start with the assumption that the historic police powers of the States [are] not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." Id.

According to AES-PR, this case is one of conflict-obstacle preemption. See Docket No. 30 at p. 17.[12] AES-PR argues that the Ordinances are preempted because they ban an activity that RCRA authorizes and encourages - namely, the beneficial use of CCRs. See Docket No. 1 at pp. 11-15; Docket No. 30 at pp. 18-23. In order to determine whether the Ordinances frustrate the purposes of RCRA, the Court must consider the purpose of the statute as a whole. Gade v. Nat'l Solid Wastes Mgmt. Ass'n, 505 U.S. 88, 98 (1992); see Grant's Dairy, 232 F.3d at 15 (beginning the "obstacle to accomplishment" brand of conflict preemption analysis by

---

[12] RCRA contains no express preemption provision, and the statute evidences no congressional intent to occupy the entire field of waste management. In fact, as discussed infra, Congress explicitly contemplates state and local participation.

considering the relevant objectives of the federal regulation at issue).

### *RCRA Overview*

The Resource Conservation and Recovery Act of 1976 ("RCRA"), 42 U.S.C. §§ 6901 *et seq.*, is a "comprehensive environmental statute that governs the treatment, storage, and disposal of solid and hazardous waste." Meghrig v. KFC W., Inc., 516 U.S. 479, 483 (1996).  When it enacted RCRA, Congress was primarily concerned with establishing the framework for a national system to ensure "the safe management of hazardous waste." Am. Min. Cong. v. E.P.A., 824 F.2d 1177, 1179 (D.C. Cir. 1987).[13]  Congress was also concerned with the "rising tide of scrap, discarded, and waste materials." 42 U.S.C. § 6901(a)(2).  While acknowledging that "the collection and disposal of solid wastes should continue to be primarily the function of State, regional, and local agencies," Congress determined that the country's waste disposal problems "have become a matter national in scope" and thus "necessitate Federal action." Id. at § 6901(a)(4).  The Act thus embraces a cooperative federalism scheme, Chico Serv. Station, Inc. v. Sol

---

[13] RCRA thus declares as "national policy" that the generation of hazardous waste "is to be reduced or eliminated as expeditiously as possible," and that hazardous waste nevertheless generated "should be treated, stored, or disposed of so as to minimize the present and future threat to human health and the environment."  42 U.S.C. § 6902; see Furrer v. Brown, 62 F.3d 1092, 1098 (8th Cir. 1995) ("The overriding purpose of RCRA is clear: to prevent generation of hazardous waste in the first place, and to dispose of and treat properly that which is produced.").

P.R. Ltd., 633 F.3d 20, 27 (1st Cir. 2011), enlisting the states
and municipalities to work with the federal government to "develop
waste management practices that facilitate the recovery of
'valuable materials and energy from solid waste,'" Blue Circle
Cement, Inc. v. Bd. of Cnty. Comm'rs of Cnty. of Rogers, 27 F.3d
1499, 1506 (10th Cir. 1994) (quoting 42 U.S.C. § 6902(a)(11))).

     RCRA delineates a bifurcated approach to the regulation of
solid waste:  Subtitle C, 42 U.S.C. §§ 6921-6939e, deals with
"hazardous waste", while Subtitle D, 42 U.S.C. §§ 6941-6949a, deals
with "nonhazardous waste."  Subtitle C contemplates a "cradle to
grave" federal regulatory system governing the generation,
transportation, treatment, storage, and disposal of "hazardous
wastes."  See City of Chicago v. Envtl. Def. Fund, 511 U.S. 328,
332 (1994).  "Nonhazardous wastes," meanwhile, "are regulated much
more loosely under Subtitle D." Id. at 331.  Pursuant to Subtitle
D, federal financial and technical assistance are available for
states that choose to develop solid waste management plans in
accordance with federal guidelines.  See Envtl. Def. Fund v.
E.P.A., 852 F.2d 1309, 1310 (D.C. Cir. 1988).[14]  Pursuant to RCRA,
the EPA identifies which wastes are hazardous and therefore subject

---

[14] With respect to solid waste collection and disposal, RCRA calls
for federal "financial and technical assistance and leadership in
the development, demonstration, and application of new and improved
methods and processes to reduce the amount of waste and
unsalvageable materials and to provide for proper and economical
solid waste disposal practices."  42 U.S.C. § 6901(a)(4).

to Subtitle C regulation.  City of Chicago, 511 U.S. at 332 (citing 42 U.S.C. § 6921(a)).  With respect to coal ash, the EPA took the drunkard's path toward regulation.  See Envtl. Def. Fund, 852 F.2d at 1310-13.  In 1980, through the so-called "Bevill Amendment," Congress effectively prevented the EPA from regulating certain mining wastes under Subtitle C, including "'[f]ly ash waste, bottom ash waste, slag waste, and flue gas emission control waste generated primarily from the combustion of coal or other fossil fuels.'"  Appalachian Voices v. McCarthy, 989 F. Supp. 2d 30, 39 (D.D.C. 2013) (quoting 42 U.S.C. § 6921(b)(3)(A)(i)).  The Amendment provided the EPA with a timeline for the completion and submission of a study to Congress to determine whether the enumerated mining wastes constituted "hazardous waste," warranting Subtitle C regulation.  See id.

When the EPA missed its statutory deadline to complete the Bevill study and report, all mining wastes remained exempt from Subtitle C regulation for many years.  Solite Corp. v. U.S. E.P.A., 952 F.2d 473, 478 (D.C. Cir. 1991).  After various interest groups brought suit to force compliance, the EPA commenced and completed regulatory determinations in 1993 and 2000.  Appalachian Voices, 989 F. Supp. 2d at 40; see 58 Fed. Reg. 42,466 (Aug. 9, 1993) (the "August 1993 Regulatory Determination"); 65 Fed. Reg. 32,214 (May 22, 2000) (the "May 2000 Regulatory Determination").  On each occasion, the EPA concluded that regulation of coal ash as

"hazardous waste" under Subtitle C was inappropriate, while indicating that it would continue to assess the need for increased regulation.  Appalachian Voices, 989 F. Supp. 2d at 40.

In the May 2000 Regulatory Determination, the EPA first addressed the "beneficial use" of coal combustion wastes.  See, e.g., 65 Fed. Reg. at 32,229-30.  The EPA listed a number of ways to repurpose coal combustion wastes beneficially, including waste stabilization and use in construction products.  Id. at 32,229. The Agency announced its determination that "national regulation under Subtitle C or Subtitle D is not warranted" for coal combustion wastes used for beneficial purposes, explaining:

> We have reached this decision because: (a) We have not identified any other beneficial uses that are likely to present significant risks to human health or the environment; and (b) no documented cases of damage to human health or the environment have been identified. Additionally, we do not want to place any unnecessary barriers on the beneficial uses of coal combustion wastes so they can be used in applications that conserve natural resources and reduce disposal costs.

Id. at 32,221.

In 2010, the issue of coal ash regulation resurfaced.  The EPA announced that it was considering whether to govern CCRs as a "hazardous waste" pursuant to Subtitle C or whether to govern CCRs as a "non-hazardous waste" pursuant to Subtitle D.  Appalachian Voices, 989 F. Supp. 2d at 39-40; see 75 Fed. Reg. 35,128 (June 21, 2010) (the "June 2010 Proposed Rule").  The EPA made clear that in neither case was it proposing to change the May 2000 Regulatory

Determination's federal regulation exemption for beneficially used CCRs.  Id. at 35,160.  The Agency noted that "[t]he beneficial use of CCRs offers significant environmental benefits," including reductions in land disposal.  Id. at 35,154.  Accordingly, the EPA expressed its "strong[] support" for the beneficial use of CCRs in an environmentally sound manner.  Id.[15]

On April 17, 2015, the EPA published a final rule addressing the disposal of CCRs, which the Agency decided to regulate pursuant to Subtitle D.  See 80 Fed. Reg. 21,302 (April 17, 2015) (the "April 2015 Rule").  Among other things, the April 2015 Rule establishes the EPA's new minimum national requirements for landfills receiving CCRs for disposal ("CCR landfills"), including location restrictions, liner design criteria, and structural integrity requirements.  See id. at 21,304-08.  The April 2015 Rule provides that "these are minimum requirements only, and without preemptive effect; states may therefore impose more stringent requirements, including the requirement that CCR facilities obtain a permit."  Id. at 21,332.  Indeed, the EPA noted that many states had already elected to develop their own beneficial use programs and found that state regulatory oversight may provide "an

---

[15] The June 2010 Proposed Rule languished until the EPA agreed, pursuant to a consent decree, to finalize its coal ash regulations by December 19, 2014.  See Citizens Coal Council v. Matt Canestrale Contracting, Inc., 51 F. Supp. 3d 593, 602 (W.D. Pa. 2014) (discussing Appalachian, 989 F. Supp. 2d 30).

additional level of assurance" in addressing site-specific risks. Id. at 21,330.

The April 2015 Rule expressly does not apply to "practices that meet the definition of a beneficial use of CCR" or "municipal solid waste landfills (MSWLFs) that receive CCRs for disposal or use as daily cover." Id. at 21,302. With respect to the MSWLF exemption, the EPA recognized that there are MSWLFs that either accept CCRs for disposal, use CCRs as daily cover, or both. Id. at 21,341. According to the EPA, the new requirements governing CCR landfills "are modeled" after the existing standards for MSWLFs, found at 40 C.F.R. § 258, so disposal of CCRs in MSWLFs is "as protective" as disposal in a CCR landfill. Id. Thus, the EPA concluded that permitted MSWLFs should not be subject to the April 2015 Rule. Id.

With respect to the beneficial-use exemption, the EPA reaffirmed its position in the May 2000 Regulatory Determination that, for the most part, beneficial uses of coal combustion wastes do not present a significant risk to human health and the environment. Id. at 21,327. The EPA noted that the beneficial use of CCRs is "a primary alternative to current disposal methods," which offers "significant environmental benefits," including "greenhouse gas reduction, energy conservation, reduction in land disposal" and "reduction in the need to mine and process virgin materials and the associated environmental impacts." Id. at

21,329.   The EPA concluded that, on balance, regulation of beneficially used CCRs is not warranted.  Id.

In doing so, the EPA acknowledged, however, that not all beneficial uses are created equally.  In its discussion of potential risks, the EPA distinguished "encapsulated" uses of CCRs from "unencapsulated" uses.  See id. at 21,327.  An "encapsulated" beneficial use is one that "binds the CCR into a solid matrix that minimizes mobilization into the surrounding environment."  Id. at 21,328.  Among the examples of encapsulated uses are filler or lightweight aggregate in concrete, filler in plastics and rubber, and raw material in concrete and wallboard production.  Id.  The EPA found that while encapsulated uses "provide benefits and raise minimal health or environmental concerns," unencapsulated uses "have raised concerns and therefore merit[] closer attention."  Id. at 21,327.  "Unencapsulated uses," which are numerous and range in total use, include structural fills, soil modification/stabilization, waste stabilization/solidification, and aggregate.  Id. at 21,353.  The EPA noted that the placement of unencapsulated CCRs on land has presented issues similar to those that prompted the regulation of CCR disposal.  Id. at 21,327.

As an example of a case in which "large quantities of unencapsulated CCR were placed on the land in a manner that presented significant concerns," the EPA discussed AES-PR's use of Agremax in Puerto Rico:

> The AES coal-fired power plant in Puerto Rico lacked
> capacity to dispose of their CCR on-site, and off-site
> landfills in Puerto Rico were prohibited from accepting
> CCR.  In lieu of transporting their CCR off of the island
> for disposal, AES created an aggregate ("AGREMAX") with
> the CCR generated at their facility, and used the
> aggregate as fill in housing developments and in road
> projects.  Over two million tons of this material was
> used between 2004 and 2012.

Id. at 21,328.  While lacking sufficient information to determine
whether this practice caused groundwater contamination, the EPA
noted that "the available facts illustrate several of the
significant concerns associated with unencapsulated uses."  Id.
at 21,328-29.  AES-PR had applied Agremax "without appropriate
engineering controls," "in volumes that far exceeded the amounts
necessary for the engineering use of the materials," and in some
cases "in residential areas" and "to environmentally vulnerable
areas, including areas close to wetlands and surface waters and
over shallow, sole-source drinking water aquifers." Id. at 21,329.
The EPA concluded that those practices would not constitute
"beneficial use," but rather "waste management that would be
subject to the requirements of the [April 2015 Rule]." Id. at
21,329.

To ensure that inappropriate uses, which often occur "under
the guise of 'beneficial use,'" are regulated as disposal, see id.
at 21,330, the April 2015 Rule establishes criteria to distinguish

"beneficial use" from "disposal," see id. at 21,349.[16] Any use that
fails to comply with the relevant criteria will be considered
"disposal" of CCRs, subject to all of the requirements in the
disposal regulations, and the user will be considered the owner or
operator of a CCR landfill.   Id.

### RCRA Preemption Analysis

As the above authority makes clear, RCRA provides varying
levels of federal oversight in an area traditionally left to state
and local governance.  Although the statute contemplates greater
federal involvement in the regulation of hazardous wastes,
"Congress appears to have adopted a markedly more circumspect
approach to the problem of non-hazardous solid waste disposal."
City of Gallatin v. Cherokee Cnty., 563 F. Supp. 940, 943 (E.D.

---

[16] Both "encapsulated" and "unencapsulated" uses must meet the
following criteria:  "(1) [t]he CCR must provide a functional
benefit; (2) [t]he CCR must substitute for the use of a virgin
material, conserving natural resources that would otherwise need to
be obtained through practices such as extraction; (3) the use of
CCR must meet relevant product specifications, regulatory
standards, or design standards when available, and when such
standards are not available, CCR are not used in excess
quantities."  80 Fed. Reg. at 21,349.

"Unencapsulated" uses involving "placement on the land of
12,400 tons or more in non-roadway applications" must meet an
additional criterion:  (4) "the user must demonstrate and keep
records, and provide such documentation upon request, that
environmental releases to groundwater, surface water, soil and air
are comparable to or lower than those from analogous products made
without CCR, or that environmental releases to groundwater, surface
water, soil and air will be at or below relevant regulatory and
health-based benchmarks for human and ecological receptors during
use."  Id.

Tex. 1983).  RCRA's guidelines for the disposal of non-hazardous waste are in general not mandatory upon the states, though states do have certain compliance incentives.  See id.

While states are afforded considerable leeway in governing solid waste disposal, principles of conflict preemption prevent local laws from imperiling RCRA's federal goals.  See Blue Circle, 27 F.3d at 1506.  Accordingly, federal courts have consistently found that a state or local ordinance that "amount[s] to an explicit or de facto total ban of an activity that is otherwise encouraged by RCRA will ordinarily be preempted by RCRA."  See id. at 1508; cf. City of Los Angeles v. Cnty. of Kern, Civ. No. 06-5094 (GAF) (VBKX), 2006 WL 3073172, at *10 (C.D. Cal. Oct. 24, 2006) ("Even where a federal statute allows more stringent state and local regulations, state and local regulations are ordinarily still preempted if they constitute a ban on an activity that Congress has encouraged, because in such cases the local ban impedes a federal objective.").

Based on this authority, AES-PR argues that the Ordinances are preempted because they impose flat bans on the beneficial use of CCRs.  See Docket No. 30 at pp. 15-20.  As discussed below, the Court finds that the language of neither law is so broad as to encompass all beneficial uses of CCRs.  AES-PR contends, however, that even if the Ordinances allow certain uses of CCRs, they are nevertheless preempted because they ban the use of CCRs as daily

cover in landfills.  (Docket No. 49 at pp. 9-10.)  But AES-PR
presupposes that the beneficial use of CCRs - particularly, as
daily cover in landfills - is a RCRA-encouraged activity.  See
Docket No. 49 at pp. 9-10.  The Court finds that while RCRA
generally seeks to promote the beneficial use of CCRs, it does not
do so to an extent that a ban on that activity is preempted.  See,
e.g., City of Los Angeles, 2006 WL 3073172, at *10; Welch v. Bd. of
Sup'rs of Rappahannock Cnty., Va., 888 F. Supp. 753, 757 (W.D. Va.
1995).

        To be sure, the EPA has steadfastly opted against regulating
the beneficial use of CCRs, in an apparent effort to encourage and
destigmatize such practices.  In the EPA's opinion, beneficial use
is, for the most part, environmentally and economically sensible.
An agency's "mere preference," however, "is vastly different from
legislation forcing states and localities to permit [beneficial
use]," especially when "no such preference for [beneficial use]
appears in the statute itself."  See Welch, 888 F. Supp. at 758;
accord Constr. Materials Recycling Ass'n Issues & Educ. Fund, Inc.
v. Burack, Civ. No. 08-CV-376 (JD), 2009 WL 205054, at *6 (D.N.H.
Jan. 27, 2009) ("General expressions of policy in federal law,
however, are unlikely to support conflict preemption.").  While the
EPA may wish to encourage companies like AES-PR to find ways to
repurpose their coal combustion waste in an environmentally sound
manner, RCRA in no way mandates this outcome.  Indeed, the Act

contemplates the disposal of CCRs (in both CCR landfills and MSWLFs) as well as several other varieties of beneficial uses, without ever indicating a discernible preference for one over the other.

In this regard, this case is distinguishable from the RCRA preemption cases upon which AES-PR relies in its briefs.  For example, AES-PR cites to Blue Circle Cement, Inc. v. Bd. of Cnty. Comm'rs of Cnty. of Rogers, 27 F.3d 1499 (10th Cir. 1994), and Ogden Envtl. Servs. v. City of San Diego, 687 F. Supp. 1436 (S.D. Cal. 1988), which struck down local laws effectively banning the treatment or recycling of hazardous waste as preempted by RCRA. Relevant to those cases, RCRA sets a national policy requiring the treatment, storage, and disposal of hazardous waste in a manner that "minimize[s] the present and future threat to human health and the environment."  42 U.S.C. § 6902.  The Act expressly states that its objective will be advanced by reducing land disposal of hazardous waste while encouraging recycling and treatment.  Id. § 6902(a)(6).  Indeed, land disposal is even prohibited in certain instances absent EPA approval.  See, e.g., id. § 6924(e).

Here, the Court finds no manifest statutory preference for beneficial use, let alone one for daily cover.  Nowhere in RCRA or its accompanying regulations does the EPA indicate that it favors one type of beneficial use (such as daily cover) over any other. This lack of directive is especially significant here, where

defendants have not completely banned CCRs within their boundaries; they simply have banned one of several possible methods of use or disposal.  See Welch, 888 F. Supp. at 757 (finding EPA's regulatory preference for land application of sewage sludge insufficient to preempt local ordinance that simply banned one of three possible methods of use or disposal).

Although agency regulations may preempt local laws, see Hillsborough Cnty. v. Automated Med. Lab., Inc., 471 U.S. 707, 713 (1985), in such a case the challenged law presumptively is not preempted, see Welch, 888 F. Supp. at 758 ("Regulations generally do not preempt state and local laws absent an express statement by the agency that it intends to do so.").  As the First Circuit Court of Appeals has noted, "[c]onflict preemption is particularly difficult to show when the most that can be said about the state law is that the direction in which state law pushes [behavior] is in general tension with broad or abstract goals" of the federal law.  See Fitzgerald v. Harris, 549 F.3d 46, 53 (1st Cir. 2008) (internal quotation marks omitted).  Here, although AES-PR "chants the conventional 'obstacle to accomplishment' mantra, it does not point to the kind of clear conflict that would warrant such a finding, or even to a genuine issue of material fact concerning that point."  See Grant's Dairy, 232 F.3d at 18.

Even if the Court were to find that the beneficial use of CCRs is a RCRA-encouraged activity, the Court disagrees with AES-PR that

the Ordinances impose a total ban on that activity.  By its terms,
the Peñuelas Ordinance forbids only the use of CCRs as "landfill
material" and is primarily directed at preventing the deposit of
CCRs on land.  See Docket No. 32-2 at p. 8, § 1.  The Humacao
Ordinance, though arguably broader in reach, bans only the use of
CCRs as "filler material."  See Docket No. 32-1 at p. 9, § 1.
According to the EPA's various statements on the matter, which are
rife with examples of beneficial uses, the Ordinances do not
scratch the surface of a wholesale prohibition.  See, e.g., 80 Fed.
Reg. at 21,328 (non-exhaustive list of encapsulated beneficial
uses); id. at 21,353 (non-exhaustive list of unencapsulated
beneficial uses); 65 Fed. Reg. at 32,229 (general examples of
beneficial applications).  For example, the Peñuelas Ordinance
presumably permits beneficial uses that do not involve the
placement of CCRs on land - such use in roofing material, use as
insulation, or for certain cement or concrete applications - while
the Humacao Ordinance's ban on use as "filler material" still
permits non-filler applications - such as waste stabilization and
solidification.  See Docket No. 41 at ¶ 8.

AES-PR contends that defendants' own admissions establish the
"complete" scope of the bans.  See, e.g., Docket No. 30 at p. 15.
When faced with AES-PR's allegation that the Ordinances "ban[] any
and all beneficial uses of 'ash' resulting from the burning of
coal," see Docket No. 1 at ¶¶ 69, 74, defendants' answer admitted

that the Ordinances "ban the use of ash resulting from the burning of coal anywhere within the territorial limits" of Humacao and Peñuelas, see Docket No. 22 at ¶¶ 16, 21. (Docket No. 49 at pp. 8-9.) Because an answer is a "pleading," pursuant to Federal Rule of Civil Procedure 7(a), AES-PR argues that this admission is binding on defendants for purposes of summary judgment. Id. at p. 8.

AES-PR is correct that "a pleading admitting a fact alleged in an antecedent pleading is [ordinarily] treated as a binding judicial admission," but "there are limits to what parties can admit." Harrington v. City of Nashua, 610 F.3d 24, 31 (1st Cir. 2010). The Court is not obligated to accept as binding judicial admissions statements that are "legal conclusions" or that are "unclear." See id.; accord Commercial Money Ctr., Inc. v. Ill. Union Ins. Co., 508 F.3d 327, 336 (6th Cir. 2007) ("Judicial admissions of fact must be deliberate and clear, while legal conclusions are rarely considered to be binding judicial admissions."); In re Teleglobe Commc'ns Corp., 493 F.3d 345, 377 (3d Cir. 2007) ("To be binding, admissions must be unequivocal. Similarly, they must be statements of fact that require evidentiary proof, not statements of legal theories." (internal citations omitted)).

Here, defendants' supposed admission that the Ordinances "ban the use of ash resulting from the burning of coal," see Docket No. 22 at ¶¶ 16, 21, cannot in good faith be understood as an

unequivocal statement regarding the scope of the Ordinances, particularly considering that defendants' answer is much broader than AES-PR's contention that the Ordinances ban "*all beneficial uses*" of such ash, <u>see</u> Docket No. 1 at ¶¶ 69, 74 (emphasis added). Even construing defendants' answer as acquiescence, the Court "is not obliged to accept a proposition of law simply because one party elects not to contest it." <u>See</u> <u>Harrington</u>, 610 F.3d at 31. The question of whether a local law operates as a total or *de facto* prohibition on a RCRA-encouraged activity is for the Court to decide. <u>See, e.g.</u>, <u>Blue Circle Cement, Inc. v. Bd. of Cnty. Comm'rs of Cnty. of Rogers</u>, 917 F. Supp. 1514, 1519 (N.D. Okla. 1995) ("The Court must next determine whether the Ordinance amounts to an 'explicit or *de facto* total ban' on the burning of [hazardous waste fuels]."); <u>Ogden</u>, 687 F. Supp. at 1446–47 (examining whether conditional use permit scheme amounted to a *de facto* ban on conducting hazardous waste incineration testing).

For these reasons, the Court finds that the Ordinances are not complete bans on the beneficial use of CCRs and that, in any event, RCRA does not encourage the beneficial use of CCRs to an extent sufficient to preempt local laws restricting this activity. As such, the Ordinances do not frustrate the purposes of RCRA and are, therefore, not preempted. AES-PR's motion for summary judgment on the federal preemption claim, (Docket No. 29), is thus **DENIED.**

### Puerto Rico Law Preemption

AES-PR also moves for summary judgment on its claim that the Ordinances are preempted by Puerto Rico law.  (Docket No. 29.)  AES-PR argues that "a municipal ordinance may not be enforced if it conflicts with legislation enacted by the Legislative Assembly of Puerto Rico."  (Docket No. 30 at p. 20.)

The Commonwealth has designated the EQB as the agency with the authority to "exercise, execute, receive and administer delegation, establish regulations, and implement a permit system in connection with" RCRA.  P.R. Laws Ann. tit. 12 § 8002g.  With respect to solid waste management, transportation, and disposal, the EQB has the authority to "adopt, promulgate, amend and repeal rules and regulations for solid waste disposal" and to "establish the sites and methods to dispose of such solid waste."  Id. § 8002c(b)(4)(A).

AES-PR contends that EQB authority authorizes the beneficial use of CCRs, including as an alternative daily cover in permitted landfills.  (Docket No. 30 at pp. 21-22.)  On May 15, 2014, AES-PR asked the EQB for authorization to dispose of CCRs in sanitary landfill systems ("SLSs") that comply with Subtitle D of RCRA.  (Docket No. 32-8 at p. 11.)  In August 2014, the EQB issued Resolution R-14-27-20 (the "August 2014 Resolution"), which delineated the only circumstances in which CCRs generated at the Guayama Facility (including Agremax) may be deposited, including as daily cover material in sanitary landfills that are "authorized to

operate by the EQB with composite or geosynthetic liner and [that] comply with the design and operation criteria laid down in [40 C.F.R. § 258]," pursuant to Subtitle D of RCRA and parallel Commonwealth law.  See Docket No. 55-1 at p. 17.  The EQB instructs that any landfill seeking to receive CCRs for use as daily cover must first request an amendment of its operating permit from the EQB and submit an amended operating and emergency plan to the EQB for approval.  Id.  AES-PR avers that the EQB approved an updated operating plan for the Coqui Landfill in Humacao authorizing the use of Agremax (identified as "rock ash") as an alternative daily cover.  (Docket No. 30 at p. 22.)

Defendants do not dispute these events, but instead argue that they acted within their delegated authority in passing laws restricting the use of CCRs.  See Docket No. 40.  Indeed, as defendants point out, Puerto Rico law permits municipalities to "regulate the solid waste collection management in harmony with the environmental policy" of the Commonwealth.  See id. at pp. 6-7 (quoting P.R. Laws Ann. tit. 21 § 4055).

While conceding that the Puerto Rico legislature granted municipalities the authority to regulate solid waste disposal, AES-PR argues that the Ordinances are not "in harmony with" Commonwealth law.  See Docket No. 30 at p. 23; Docket No. 49 at p. 11.  In support of this argument, AES-PR contends that this case is analogous to Liberty Cablevision of P.R. v. Municipality of

Caguas, 417 F.3d 216 (1st Cir. 2005).  At issue in Liberty
Cablevision was the federal Cable Act, which empowered state
governments to designate a "franchising authority" to negotiate
with cable operators seeking to use public "rights-of-way."  See
id. at 219-20.  Pursuant to the Cable Act, the designated
"franchising authority" was authorized to grant franchises to cable
companies and to collect a maximum of five percent of gross
revenues as "franchise fees" in exchange for use of the public
"rights-of-way."  Id.

     Puerto Rico had created an agency - the Telecommunications
Regulatory Board of Puerto Rico (the "TRB") - to be its
"franchising authority."  Id. at 220.  Although the TRB was
collecting fees pursuant to its franchise agreements with cable
companies, several municipalities in Puerto Rico began to impose
five percent fees for use of the same "rights-of-way."  Id.
Together, these fees exceeded Congress's explicit cap.  See id.
at 221.  Based on federal conflict preemption principles, the First
Circuit Court of Appeals held that the federal Cable Act preempted
the municipalities' attempts to charge additional franchise fees.
See id. at 221-22.

     After announcing its holding, the First Circuit Court of
Appeals went on to address the municipality's flawed arguments for
upholding their fee ordinances.  For example, the municipalities
had argued that they were entitled to compensation as "owners" of

Civil No. 14-1767 (FAB)                                               43

these rights-of-way.  In rejecting this argument, the court noted
that municipalities possess no inherent powers, but derive them
from the state.  Id.  The court further noted that, pursuant to
Puerto Rico law, municipal ordinances must be "in harmony with"
Commonwealth law and that Commonwealth law prevails in cases of
conflict.  Id. at 222.  There, because Puerto Rico had created the
TRB as its "*sole* franchising authority," the court found that "the
municipalities' attempts to regulate cable companies by charging
franchise fees . . . conflict with Puerto Rico legislation and
necessarily fail."  Id. (emphasis added).  The Court pointed out
that the Commonwealth had not, during the relevant time period,
enacted legislation enabling the municipalities to assess fees for
use of the public "rights-of-way."  Id. at 222-23 & n.8.

     The Court finds that Liberty Cablevision is distinguishable
and unavailing for AES-PR.  In Liberty Cablevision, the
municipalities lacked state-granted authority, whereas here, Puerto
Rico's   Legislative   Assembly   has   specifically   permitted
municipalities to regulate in the arena of solid waste management.
In any event, the relied-upon language of Liberty Cablevision is
*dicta*, because the case was decided on federal preemption grounds.
Its holding does not support AES-PR's argument that municipal
ordinances restricting certain uses of CCRs are necessarily
preempted by a state agency's delineation of the conditions under
which CCRs may be properly disposed.

Without further support or elaboration, the Court declines to strike down the Ordinances as out of "harmony" with Commonwealth law, particularly because Commonwealth law permits both the EQB and municipalities to regulate in this arena.

In sum, for the above reasons, the Court finds that neither federal nor Commonwealth law preempt the Ordinances. AES-PR's motion for partial summary judgment, (Docket No. 29), is therefore **DENIED**.

### CONCLUSION

For the above reasons, the Court **GRANTS** AES-PR's requests for judicial notice, (Docket No. 32; Docket No. 49 at p. 9), **DENIES** defendants' motion for judgment on the pleadings, (Docket No. 37), and **DENIES** AES-PR's motion for partial summary judgment, (Docket No. 29).

**IT IS SO ORDERED.**

San Juan, Puerto Rico, October 1, 2015.

<u>s/ Francisco A. Besosa</u>
FRANCISCO A. BESOSA
UNITED STATES DISTRICT JUDGE