**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO**

AES PUERTO RICO, L.P.,

    **Plaintiff,**

          **v.**               **Civil No.** 14-1767 (FAB)

MARCELO   TRUJILLO-PANISSE,   *et
al.,*

    **Defendants.**

**OPINION AND ORDER**

BESOSA, District Judge.

    Two Puerto Rican municipalities, Humacao and Peñuelas, passed ordinances restricting the use of ash derived from coal combustion within their territorial borders.   AES Puerto Rico, L.P. ("AES-PR"), a coal-fired power plant owner, filed suit against the municipalities to challenge the legality of the ordinances. (Docket No. 1.)

    Before the Court are AES-PR's second motion for partial summary judgment, (Docket No. 84), related statement of undisputed facts, (Docket No. 85), and related motion for judicial notice, (Docket No. 86).   Defendants, the municipalities and their mayors, opposed plaintiff's motion for partial summary judgment, (Docket No. 107), and plaintiff replied, (Docket Nos. 115, 117).

    Also before the Court are defendants' motion for summary judgment, (Docket No. 88), related statement of uncontested facts, (Docket No. 89), and motion for judicial notice, (Docket No. 90).

Plaintiff opposed defendants' motion for summary judgment, (Docket No. 108), responded to their request for judicial notice, (Docket No. 110), and responded and moved to strike exhibits attached to defendants' statement of uncontested facts, (Docket Nos. 109, 111). Defendants opposed plaintiff's motion to strike.  (Docket No. 118.)

The Court has already ruled on a partial motion for summary judgment and judgment on the pleadings filed by AES-PR addressing the federal and Commonwealth preemption claims.  (Docket No. 60.)

## I.  REQUESTS FOR JUDICIAL NOTICE AND MOTION TO STRIKE EXHIBITS

Before reviewing the facts underlying the parties' motions for summary judgment, the Court first evaluates the admissibility of the documents presenting those facts.  Thus, the Court reviews the parties' requests for judicial notice, (Docket Nos. 86, 90), and plaintiff's motion to strike, (Docket No. 111).

## A.  Requests for Judicial Notice

Both parties request that the Court take judicial notice of several documents.  (Docket Nos. 86, 90).  Federal Rule of Evidence 201(b) allows a court to take judicial notice of "a fact that is not subject to reasonable dispute because it:  (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."  Fed. R. Evid. 201(b).  Thus, to be reasonably indisputable in order to qualify for judicial notice, a fact must meet at least one of those two prongs.  "[The] party

requesting judicial notice bears the burden of persuading the trial judge that the fact is a proper matter for judicial notice." In re Tyrone F. Conner Corp., Inc., 140 B.R. 771, 781 (Bankr. E.D. Cal. 1992) (citing In re Blumer, 95 B.R. 143 (9th Cir. BAP 1988)).

### 1.   Plaintiff's Request for Judicial Notice

AES-PR requests that the Court take judicial notice of the following documents as exhibits to its motion for partial summary judgment:

(1)   Municipality of Humacao Ordinance Number 21, Series 2013-2014 (the "Humacao Ordinance") (Docket No. 86-1)[1];

(2)   Municipality of Peñuelas Ordinance Number 13, Series 2012-2013 (the "Peñuelas Ordinance") (Docket No. 86-2);

(3)   AES-PR Guayama facility's Puerto Rico Environmental Quality Board ("EQB") Operating Permit (Docket No. 86-3);

(4)   El Coqui Landfill's EQB Permit to Operate a Facility for Final Disposal of Non-Hazardous Solid Waste (Docket No. 86-4);

(5)   Peñuelas Valley Landfill's EQB Permit to Operate a Facility for Final Disposal of Non-Hazardous Solid Waste (Docket No. 86-5);

(6)   the Environmental Protection Agency ("EPA")'s August 14, 2014 letter to the EQB (Docket No. 86-6);

(7)   the EQB's August 27, 2014, Resolution No. R-14-27-20 (Docket No. 86-7);

(8)   the EQB's October 15, 2015, Resolution No. R-15-23-1 (Docket No. 86-8);

---

[1] The Court uses the page and document numbers generated by the electronic case filing system, not document references submitted by the parties.

    (9)  Ecosystems Landfill's EQB Permit to Operate a Facility for Final Disposal of Non-Hazardous Solid Waste (Docket No. 86-9); and

    (10) the English translation of Puerto Rico Tourism Co. v. Municipality of Vieques, 179 P.R. Dec. 578 (2010) (Docket No. 86-10).

(Docket No. 86 at pp. 1-2.)  Defendants do not challenge AES-PR's requests for judicial notice.

Pursuant to Federal Rule of Evidence 201, the Court already took notice of documents 1, 2, 3, 4, and 7 as authentic public records.  (Docket No. 60 at pp. 9-11.)  Pursuant to the same authority, the Court takes judicial notice of the existence of documents 5, 6, 8, 9, and 10 as public records whose authenticity is not disputed.  Document 6, the EPA letter, is "relevant not for the truth of anything asserted in it but simply as a legally significant event . . . ."  See Torrens v. Lockheed Martin Servs. Grp., Inc., 396 F.3d 468, 473 (1st Cir. 2005).  Taking judicial notice of the existence of document 10, the Puerto Rico Tourism Co. order,[2] not its content, does not elevate it from a source of persuasive authority to one of binding authority.  See Peviani v. Hostess Brands, Inc., 750 F. Supp. 2d 1111, 1117 (C.D. Cal. 2010).

Accordingly, the Court finds the above documents appropriate for judicial notice.  AES-PR's request for judicial notice, (Docket No. 86), is **GRANTED.**

---

[2] The Court considers all citations to P.R. Tourism Co. v. Mun. of Vieques, 179 P.R. Dec. 578 (P.R. 2010) as referring to the English translation submitted by plaintiff.

### 2.   Defendants' Request for Judicial Notice

Defendants request that the Court take notice of nineteen documents, (Docket No. 90), and plaintiff opposes this request on numerous grounds, (Docket No. 110).  Defendants request that the Court take judicial notice of the following documents:

(1)   the publication by Alan H. Lockwood and Lisa Evans titled Ash in Lungs:  How Breathing Coal Ash is Hazardous to Your Health (Docket No. 90-1);

(2)   the EPA's November 7, 2011, letter to the EQB (Docket No. 90-2);

(3)   the publication by B. Gottlieb, *et al.*, Coal Ash:  The Toxic Threat to Our Health and Environment (Sept. 2010) (Docket No. 90-3);

(4)   the EPA publication 600/R.-12/724 by A.C. Garrabrants, *et al.*, titled Leaching Behavior of "AGREMAX" Collected from a Coal-Fired Power Plant in Puerto Rico (Dec. 2012) (Docket No. 90-4);

(5)   the Puerto Rico Senate Report on Bill 340 (Oct. 2013) (Docket No. 103-1);

(6)   the Test America, Inc. Analytical Report by S. Hoffman titled Summary of Analysis of a Coal Ash Sample Taken in Salinas, Puerto Rico (Sept. 28, 2010) (Docket No. 90-6);

(7)   the *El Nuevo Día* newspaper article by G. Cordero, titled Bill for Regulation of Toxic Coal Ash (Sept. 11, 2013) (Docket No. 103-2);[3]

(8)   the Peñuelas Ordinance (Docket No. 90-8);

(9)   the Humacao Environmental Quality and Natural Resources Commission Report (Oct. 10, 2013) (Docket No. 90-9);

(10)   the Humacao Ordinance (Docket No. 90-10);

---

[3]  Because page 2 of defendants' document 7 is not part of the newspaper article, the Court declines to consider it.

(11) the Puerto Rico Senate Resolution 1158 (May 13, 2015) (Docket No. 103-4);

(12) the Puerto Rico House of Representatives Tenth Partial Joint Report on Resolution No. 305 (Feb. 13, 2007) (Docket No. 103-10);

(13) the *El Nuevo Día* newspaper article by G. Alvarado-Leon titled <u>AES Coal Ash Toxic</u> (Mar. 14, 2013) (Docket No. 103-5);

(14) the *El Nuevo Día* newspaper article by G. Alvarado-Leon titled <u>AES Ashes in Arduous Debate</u> (Docket No. 103-6);

(15) the *El Nuevo Día* newspaper article by R. Tellado-Domenech titled <u>House of Representatives Hones in Aim on AES</u> (July 12, 2015) (Docket No. 103-7);

(16) the *El Nuevo Día* newspaper article by C. Quiles titled <u>Firmly Against Coal Ash Disposal</u> (Docket No. 103-8);

(17) the EPA's July 16, 2012 letter to the EQB (Docket No. 90-17);

(18) the EPA publication titled <u>Soil Screen Guidance:  Fact Sheet</u> (July 1996) (Docket No. 90-18);

(19) the University of Puerto Rico Department of Chemistry Resolution (May 13, 2015) (Docket No. 103-9).

(Docket No. 90 at pp. 2-4.)  Despite uncertainty regarding the relevance of these documents,[4] the Court will review defendants' documents to determine their appropriateness for judicial notice.

---

[4] The relevance of the documents that defendants seek to have noticed is unclear because, apart from quoting the text of the Ordinances, (Docket No. 88 at pp. 7-9), defendants have not cited to these documents in either their motion for summary judgment, (Docket No. 88), statement of uncontested facts, (Docket No. 89), or response in opposition to plaintiff's motion for partial summary judgment, (Docket No. 107).  <u>See</u> <u>Walker v. Woodford</u>, 454 F. Supp. 2d 1007, 1022-23 (S.D. Cal. 2006) (declining to judicially notice documents whose relevance was indiscernible).

### a.   Undisputed Public Records

Pursuant to Federal Rule of Evidence 201, the Court already took notice of documents 8 and 10 as authentic public records.  See Docket No. 60 at pp. 9-11.  Pursuant to the same authority, the Court takes judicial notice of the existence of documents 2, 5, 11, 12, and 17 as public records whose authenticity is not questioned.  As with the EPA letter noticed for plaintiff above, defendants' EPA letters, documents 2 and 17, are relevant only as "legally significant event[s]," not for the truth of the statements contained within them.  See Torrens, 396 F.3d at 473.

Defendants also request that the Court take judicial notice of document 6, a report by a private company.  (Docket No. 90 at p. 3.)  The Court declines to do so.  Document 6 is produced by a private company, Test America, Inc., not by a government agency or office, and thus, does not qualify for judicial notice as a public or government document.

### b.   Newspaper Articles

Defendants' documents 7, 13, 14, 15, and 16 are newspaper articles published in *El Nuevo Dia*, a Puerto Rico newspaper. Newspaper articles, as inadmissible hearsay, are not suitable for judicial notice to establish the truth of the matter asserted, but may be noticed to show that an event was publicized. See U.S. ex rel. Osheroff v. Humana Inc., 776 F.3d 805, 811 n.4 (11th Cir. 2015) ("[C]ourts may take judicial notice of documents

such as the newspaper articles at issue here for the limited purpose of determining which statements the documents contain (but not for determining the truth of those statements)."); United States v. Griffin, 525 F.2d 710, 711, (1st Cir. 1975) (taking judicial notice of newspaper files to establish that an ongoing event received substantial publicity); People v. McKinney, 670 N.W. 2d 254, 258 n.4 (Mich. Ct. App. 2003) (excluding newspaper articles as inadmissible hearsay); see also U.S. ex rel. Hagerty v. Cyberonics, Inc., 95 F. Supp. 3d 240, 256 (D. Mass. 2015) (noticing news articles in order to analyze whether facts had been publicly disclosed prior to employee's whistle-blowing). But see Pearce v. Faurecia Exhaust Sys., Inc., 529 F. App'x 454, 459 (6th Cir. 2013) (noting that a newspaper may be an acceptable source to establish that a fact is "common knowledge" appropriate for judicial review). Therefore, the Court takes judicial notice of the fact that *El Nuevo Dia* printed several articles regarding the use of coal ash by AES-PR in Humacao and Peñuelas, but does not take judicial notice of the contents of those articles.

### c.   Scholarly Research Publications

Defendants' documents 1, 3, 4, 18 and 19[5] are scholarly research publications. The content of scholarly articles may not be judicially noted because facts within scholarly articles are prohibited legislative facts because they apply beyond the

---

[5] The scholarly nature of document 19 is debatable.

facts of a particular case.  Fed. R. Evid. 201 (noting that
"legislative facts" may not be noted judicially); Fed. R. Evid. 201
advisory committee's note to Rule 201 (defining "adjudicative
facts" as "simply the facts of the particular case" and
"legislative facts" as facts "that have relevance to legal
reasoning and the lawmaking process").

        Due to the structure of academia, facts in scholarly
articles are often developing concepts that are vigorously debated
and thus are "hardly sources 'whose accuracy cannot reasonably be
questioned.'"  United States v. Simon, 842 F.2d 552, 555 (1st Cir.
1988); see Ctr. for Biological Diversity v. Morgenweck, 351 F.
Supp. 2d 1137, 1144 (D. Colo. 2004) (admitting scholarly articles
to show defect in rule-making procedure, but not as proof of the
truth of the matters asserted because their facts were not
"universally known" pursuant to Federal Rule of Evidence
201(b)(2)).  Accordingly, the Court does not take judicial notice
of defendants' documents 1, 3, 4, 18, and 19.

        **d.   Municipal Reports**

        Defendants' document 9 is a municipal report.
Although there is a trend away from the old rule of excluding
municipal ordinances due to an increase in the ability to obtain
and authenticate copies of these ordinances, Getty Petroleum Mktg.,
Inc. v. Capital Terminal Co., 391 F.3d 312, 322-24 (1st Cir. 2004)
(Lipez, J. concurring), this trend has not extended to allow for

inclusion of municipal reports through the mechanism of judicial notice. Accordingly, the Court declines to take judicial notice of document 9.

In summary, the Court **GRANTS IN PART** and **DENIES IN PART** defendants' request for judicial notice, (Docket No. 90). The Court takes judicial notice of one fact, that *El Nuevo Dia* printed several articles regarding the use of coal ash by AES-PR in Humacao and Peñuelas, and of the following documents:

    (2)  the EPA's November 7, 2011, letter to the EQB (Docket No. 90-2);

    (5)  the Puerto Rico Senate Report on Bill 340 (October 2013) (Docket No. 103-1);

    (8)  the Peñuelas Ordinance (Docket No. 90-8);

    (10) the Humacao Ordinance (Docket No. 90-10);

    (11) the Puerto Rico Senate Resolution 1158 (May 13, 2015) (Docket No. 103-4);

    (12) the Puerto Rico House of Representatives Tenth Partial Report on Resolution No. 305 (February 13, 2017) (Docket No. 103-10);

    (17) the EPA's July 16, 2012 letter to the EQB (Docket No. 90-17);

The Court declines to take judicial notice of documents 1, 3, 4, 6, 7, 9, 13, 14, 15, 16, 18, and 19, because they do not "fall into the limited category of documents" appropriate for judicial notice pursuant to Rule 201. <u>Walker</u>, 454 F. Supp. 2d at 1024.

## B.   Motion to Strike Exhibits

Plaintiff seeks to strike all exhibits that support defendants' statement of uncontested facts, (Docket No. 89), challenging the admissibility of defendants' use of their own 30(b)(6) witnesses testimony, the statements within the "whereas clauses" of the municipal Ordinances, defendants' lay witness testimony, and defendants' interrogatory responses.  (Docket No. 111.)  District courts do "not, however, have the authority to strike information from a party's memorandum of law [or attached exhibits]." McGrath v. Town of Sandwich, No. 13-12381-NMG, 2015 WL 5722728, at *7 (D. Mass. Sept. 29, 2015); see also Judson v. Midland Credit Mgmt., Inc., No. 13-11435-TSH, 2014 WL 4965944, at *3 (D. Mass. Oct. 1, 2014).

Federal Rule of Civil Procedure 12(f) authorizes a court to "strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter."  Fed. R. Civ. P. 12(f).  "Pleading," as defined in Federal Rule of Civil Procedure 7(a), "does not encompass motions, memoranda or exhibits to memoranda." McGrath, 2015 WL 5722728, at *7; see also Marcello v. Maine, 489 F. Supp. 2d 82, 85-86 (D. Me. 2007).  Accordingly, the First Circuit Court of Appeals has refused to strike motions and supporting exhibits pursuant to Rule 12(f).  See, e.g., Pilgrim v. Trs. of Tufts Coll., 118 F.3d 864, 868 (1st Cir. 1997), abrogated on other grounds, 303 F.3d 387 (1st Cir. 2002) (stating that a

motion to strike "has no applicability to motions made in pursuit of or in opposition to summary judgment").  The Court, therefore, **DENIES** plaintiff AES-PR's motion to strike, (Docket No. 111.)

## II.  MOTIONS FOR SUMMARY JUDGMENT

**A.  Background**[6]

**1.  AES**

AES-PR owns and operates a coal-fired power plant in Guayama, Puerto Rico, supplied by coal imported from Colombia. (Docket No. 85 at pp. 1-2.)  Pursuant to a twenty-five year Power Purchase and Operating Agreement ("PPA") with the Puerto Rico Electric Power Authority ("PREPA"), AES-PR burns coal at the Guayama plant to create electricity, supplying 15% of Puerto Rico's daily electricity consumption and creating 200,000-250,000 tons of ash each year.  Id.; Docket No. 109 at p. 32.  The by-product of burning the coal is ash called coal combustion residuals ("CCRs"), which come in two forms – fly ash and bottom ash – and when mixed with water, solidify into rock ash.  (Docket No. 85 at p. 2.) According to the federal EPA and the Puerto Rico EQB, CCRs are not hazardous waste, a fact confirmed through monthly monitoring tests performed by an independent laboratory on behalf of AES-PR.  Id. at pp. 3-4.

AES-PR markets its rock ash under the name AGREMAX ("Agremax") and sells it to landfills for use in solidifying liquid

---

[6] For additional background information, see Docket 60 at pp. 2-9.

waste before the liquid waste is deposited into the landfill.
(Docket No. 85 at pp. 2-3.)   AES-PR also sells CCRs as an
alternative daily cover[7] for solid waste.   Id.   Disposal of CCRs
not used for these purposes also occurs in sanitary landfills.   Id.
at p. 3.   An amendment to the PPA approves use or disposal of CCRs
if that action is authorized by the Commonwealth.   (Docket Nos. 109
at p. 32; 109-5 at pp. 171-172.)

     AES-PR currently has contracts to dispose of CCRs,
including Agremax, at El Coqui Landfill in Humacao, Puerto Rico
("El Coqui Landfill"), Ecosystems Peñuelas Landfill in Peñuelas,
Puerto Rico ("Ecosystems Landfill"), and Peñuelas Valley Landfill,
LLC ("Peñuelas Valley Landfill").   (Docket No. 85 at pp. 4-5.) AES-
PR also has contracts for use of CCRs as daily cover at Peñuelas
Valley and Ecosystems Landfills.   Id.   Additionally, CCRs are used
as liquid waste solidification at Peñuelas Valley Landfill.   Id.
El Coqui Landfill and Ecosystems Landfill are lined, sanitary
landfills in compliance with the federal Resource Conservation and
Recovery Act ("RCRA") subtitle D, which regulates non-hazardous
waste.   Id.   Both landfills have "an engineered liner system with
an impermeable synthetic liner . . . and other measures to protect
the environment, such as a storm-water management system to control

---

[7] Daily cover at a landfill, typically comprised of uncultivated
soil, "helps control disease, prevent fires, minimize odors,
prevent blowing litter, and reduce scavenging." (Docket No. 85 at
p. 3.)  Native, or undisturbed, soil is often used as daily cover.
Id.

run-off and sprinklers and water trucks to prevent the spread of dust." Id. If prohibited from acting pursuant to these contracts, AES-PR would incur significant costs in securing alternative outlets for disposal and use of the ash created at its power generating facility. (Docket No. 85 at p. 21.)

### 2.   The Puerto Rico EQB and Federal EPA

The EPA, the agency responsible for monitoring and regulating solid waste throughout the United States, RCRA, 42 U.S.C. § 6912(a)(1), notes that it is possible to use or dispose of CCRs in a RCRA Subtitle D-compliant sanitary landfill "in a manner that does not present a health risk to the public."[8] (Docket No. 85 at p. 12.) The EPA does not believe that a total ban of CCR disposal in Puerto Rico is necessary. Id. at p. 7; see also Docket 86-6 at p. 2.

The EQB was created by the Puerto Rico Legislative Assembly with various powers and duties, including "adopt[ing], promulgat[ing], amend[ing] and repeal[ing] rules and regulations for solid waste disposal and establish[ing] the sites and methods to dispose of such solid waste." P.R. Law Ann. tit. 12 § 8002c(b)(4)(A). The EQB is also tasked with "discharg[ing] necessary and reasonable functions as to the planning and development of the public policy concerning the problems posed by

---

[8] AES's expert, Dr. Brent Finley, agrees that "using or disposing of Agremax in a lined, sanitary landfill does not present a risk to public health." (Docket No. 109 at p. 6.)

solid waste in Puerto Rico," id. § 8002c(b)(1)(J), which includes
"[c]onducting research, studies, inspections, and analyses to
verify compliance with [the EQB Act] and the regulations approved
thereunder by the Governing Board of the Environmental Quality
Board," id. § 8002c(a)(4).  Accordingly, the EQB is the expert
agency responsible for conducting environment studies and
regulating landfill operations in Puerto Rico.  (Docket No. 85 at
p.6.)  Municipalities lack resources and expertise to do this
testing and monitoring at the municipal level.  (Docket No. 85 at
pp. 6-7.)

        The EPQ agrees with the EPA that it is possible to use or
dispose of CCRs in a way that is not hazardous to human health as
long as CCRs are used or disposed of in sanitary landfills that
comply with RCRA Subtitle D.  (Docket No. 85 at pp. 7-8 (quoting
EQB Resolution R-14-27-20).)  The EQB has issued resolutions
regarding the steps necessary to obtain authorization to use CCRs
in subtitle-D compliant sanitary landfills.  See, e.g., Docket

Nos. 86-7 (R-14-27-20); 86-8 (R-15-23-1).[9]  Currently, the EQB has approved disposal of CCRs and rock ash (Agremax) at Ecosystems Landfill, a subtitle D-compliant landfill.[10]  See Docket No. 86-9. The EQB has also authorized the use of CCRs to solidify liquid waste at Peñuelas Valley Landfill.  (Docket No. 85 at p. 5.)

### 3.   The Municipal Ordinances

Two municipalities in Puerto Rico, Humacao and Peñuelas, enacted Ordinances restricting the use of coal ash within their territorial borders.  Both Ordinances reference AES as a producer

---

[9] R-15-23-1, when read in conjunction with R-14-27-20, details the processes for obtaining EQB approval for disposal of CCRs and for use of CCRs and rock ash (Agremax) as alternative daily cover.  See Docket Nos. 86-7, 86-8.  According to R-14-27-20, to dispose of CCRs and rock ash or to use CCRs and rock ash as alternative daily cover, the subtitle D-compliant sanitary landfill must obtain an amended EQB operating permit that includes CCRs in the landfill's list of non-hazardous solid waste.  (Docket No. 86-7 at pp. 14-15.) According to R-15-23-1, a subtitle D-compliant sanitary landfill that seeks to use CCRs or rock ash as alternative daily cover must also obtain a waiver from the EQB in addition to amending its operating permit.  (Docket No. 86-8 at pp. 4-6.)

[10] EQB Resolution R-15-23-1 authorizes the amendment of Peñuelas Valley and El Coqui Landfills' operating permits to include CCRs and rock ash in the list of non-hazardous solid waste that may be disposed of in those landfills.  (Docket No. 86-8 at p. 8.)  In January 2016, the EQB approved an amended operating permit for Ecosystems Landfill, which includes "coal combustion residues [CCRs]; fly, light or top ash and bed, heavy or bottom ash; [and] mixed coal combustion residues (dry ash and rock ash)" in the list of non-hazardous solid waste authorized for disposal in that landfill.  (Docket No. 86-9 at p. 3.)  The Court has received no evidence that the EQB has approved an amended operating permit for the Peñuelas Valley and El Coqui Landfills.  Additionally, no waiver has been submitted to the EQB to request use of CCRs or rock ash (Agremax) as alternative daily cover.  (Docket No. 86-6 at pp. 6.)

of coal ash in Puerto Rico and Agremax as an AES-PR product.

(Docket Nos. 86-1 at pp. 8-9; 86-2 at pp. 6, 8.)

On April 10, 2013, the Municipality of Peñuelas adopted

the Peñuelas Ordinance, which provides:

> The use of ashes coming from the burning of coal, in
> energy generating plants, as landfill material and its
> depositing on lands within the territorial limits of the
> Municipality of Peñuelas is forbidden.

(Docket No. 86-2 at pp. 8, 10.)

On February 10, 2014, the Municipality of Humacao adopted

the Humacao Ordinance, which provides:

> Any kind of use of the ash derived from coal combustion
> in electric power generating plants or any other
> industrial or commercial activity as filler material,
> whether to level the terrain, for landfills, or in any
> other kind of filler, is hereby prohibited within the
> territorial limits of the Autonomous Municipality of
> Humacao.

(Docket No. 86-1 at pp. 9-10.)  The Humacao and Peñuelas Ordinances

prohibit depositing CCRs in the ground anywhere within the

municipalities' limits.  (Docket Nos. 85 at pp. 14, 17; 89 at

pp. 1-2.)[11]  Thus, these Ordinances prohibit the beneficial use of

---

[11] Despite AES-PR's argument, (Docket No. 111 at p. 2), Federal Rule
of Civil Procedure 32 does not preclude defendants from using their
own Rule 30(b)(6) witnesses' testimony to support their motion for
summary judgment.  See Re-Ace, Inc. v. Wheeled Coach Indus., Inc.,
364 F. Supp. 2d 163, 164 (D.P.R. 2005) (Gelpi, J.) (considering
deposition testimony of plaintiff-company's own chief executive
officer on a motion for summary judgment) (citing Cadle Co. v.
Hayes, 116 F.3d 957, 961 n.5 (1st Cir. 1997)); Plumley v. S.
Container, Inc., No. 00-140-P-C, 2001 WL 1188469, at *2, 4-5 (D.
Me. Oct. 9, 2001) (considering deposition testimony of defendant's
own plant manager in support of its motion for summary judgment.)

CCRs, disposal of CCRs, and use of CCRs as daily cover to the extent that those activities involve depositing CCRs in the ground within the municipal limits.  (Docket Nos. 85 at p. 14; 89 at pp. 1-2.)  Additionally, the Peñuelas Ordinance prohibits the use of CCRs to solidify liquid waste if doing so involves putting CCRs on the ground within the municipal limits.  (Docket Nos. 85 at p. 18; 89 at p. 1.)  The Ordinances do not prohibit all uses of CCRs, only those that involve depositing CCRs on the ground.  (Docket No. 89 at pp. 2-3.)

        The purpose of these Ordinances is to protect the well-being of the people and environment of Humacao and Peñuelas. (Docket No. 89 at pp. 1-3.)  In passing these Ordinances, neither municipality conducted studies or gathered data to determine whether depositing CCRs in sanitary landfills poses a risk to public health, (Docket No. 85 at pp. 15, 19), but instead relied on studies conducted by others, including a 2012 Vanderbilt University Report, (Docket No. 90-4), a 2012 Puerto Rico Senate Report, an EPA study, a case in the Dominican Republic, and a 2010 study conducted in Parque Gabriela Development in Salinas, Puerto Rico.  (Docket No. 89 at pp. 3-4.)  Humacao does not want [CCRs] anywhere within [its] geographical area and Peñuelas wants CCRs deposited [a]nywhere else in Puerto Rico or outside of Puerto Rico.  (Docket No. 85 at pp. 16, 20.)

It is defendant municipalities' position that when rock ash is transported or dumped on the ground, dust is created which spreads to surrounding areas in the air, and in the water through run-off. (Docket No. 89 at p. 5.) As a result, residents breathe the ash dust and consume it in drinking water. Id. AES-PR sprays Agremax with water prior to transporting it and transports coal ash in "totally enclosed tanker[s]." (Docket No. 109 at pp. 33-34.)

Pursuant to the Humacao Ordinance, the Municipality of Humacao fined El Coqui Landfill for accepting Agremex. (Docket No. 109 at p. 35.) Humacao has also threatened to terminate its municipal waste contracts with El Coqui Landfill if it continues to receive Agremax. Id. Pursuant to the Peñuelas Ordinance, the Municipality of Peñuelas has physically blocked the entrance to Peñuelas Valley Landfill to prevent AES-PR from delivering CCRs to the landfill. Id.

### 4.   Donato-Ramos and the Cloud

In June 2015, Zugeily Donato-Ramos ("Donato-Ramos") observed, while driving, a dense cloud near the landfill in Humacao. (Docket No. 89 at p. 4.) She took photos and video of the cloud with her cellular phone. Id. at pp. 4-5. In her sworn statement, Donato-Ramos states that the cloud was composed of ash coming from the landfill. Id. at p. 4. The sworn statements of AES-PR's lay and expert witnesses refute that the cloud was made of ash and that visibility was possible at the time Donato-Ramos took

the pictures.  (Docket No. 109 at p. 28.)  Additionally, no Agremax was delivered to El Coqui Landfill in June, but other earthmoving work and odor control operations occurred.  (Docket No. 109 at pp. 36-37.)

## B.   Summary Judgment Standard

Viewing the facts in the light most favorable to the nonmoving party, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56; Friends of Merrymeeting Bay v. Hydro Kennebec, LLC, 759 F.3d 30, 33-34 (1st Cir. 2014).  The role of summary judgment is to "pierce the boilerplate of the pleadings and assay the parties' proof in order to determine whether trial is actually required." Tobin v. Fed. Express Corp., 775 F.3d 448, 450 (1st Cir. 2014) (quoting Wynne v. Tufts Univ. Sch. of Med., 976 F.2d 791, 794 (1st Cir. 1992)).  "When the nonmovant bears the burden of proof on a particular issue, she can thwart summary judgment only by identifying competent evidence in the record sufficient to create a jury question."  Id. at 450-51.  The Court disregards unsupported and conclusory allegations.  McGrath, 757 F.3d 20, 25 (1st Cir. 2014).

"Cross-motions for summary judgment do not alter the summary judgment standard, but instead simply require [the court] to determine whether either of the parties deserves judgment as a

matter of law on the facts that are not disputed." Wells Real
Estate Inv. Trust II, Inc. v. Chardon/Hato Rey P'ship, S.E., 615
F.3d 45, 51 (1st Cir. 2010) (internal quotation marks omitted).
For cross-motions for summary judgment that are filed within a few
days of each other, courts "should consider the two motions at the
same time, applying the same standards to each motion." Id. at 51
(quoting P.R. Am. Ins. Co. v. Rivera-Vázquez, 603 F.3d 125, 133
(1st Cir. 2010) (noting that the requirement to decide each motion
separately does not require that "each motion must be considered in
a vacuum."))

## C.   Preemption

Plaintiff and defendants both move for summary judgment on the
issue of preemption.  Plaintiff argues that the Court's previous
decision on the issue of preemption, (Docket No. 60), is no longer
correct because subsequent EQB actions have created a direct
conflict between Commonwealth and municipal law.  (Docket Nos. 84
at p. 1; 84-1 at pp. 6-7; 108 at pp. 21-22.)  Specifically,
plaintiff highlights the EQB action of "issu[ing] resolution [R-15-
23-1] on October 15, 2015[, which] authorizes the use and disposal
of AES-PR's CCRs, including Agremax, at El Coquí Landfill in
Humacao and Peñuelas Valley Landfill in Peñuelas." (Docket No. 84-
1 at pp. 6-7.)  Defendants rebut plaintiff's argument claiming that
the Court's previous decision should stand and requesting that the

Court dismiss plaintiff's Supremacy Clause claim. (Docket Nos. 88 at pp. 13-14; 107 at pp. 12-14.)[12]

Plaintiff does not allege any changes in federal law that would affect the Court's previous federal preemption analysis. Because EQB resolutions pertain to the intersection of state and local governance, the issuance of an EQB resolution has no effect on the Court's federal preemption analysis. See Docket 60 at pp. 21-39. Accordingly, the Court **AFFIRMS** its previous decision to **DENY** plaintiff summary judgment and to dismiss the federal preemption claim because the municipal Ordinances do not frustrate the purpose of the RCRA, 42 U.S.C. §§ 6901 *et seq.* Id. at 39. Also, because the language of the municipal Ordinances has not changed since the Court's prior decision, the Court **AFFIRMS** its view that the municipal Ordinances are not complete bans on the beneficial use of CCRs. Id. at 36-39.

Building off of the Court's previous analysis, see Docket No. 60 at pp. 40-44, the Court considers the impact of the EQB's October 2015 resolution on plaintiff's Puerto Rico law preemption

---

[12] Additionally, defendants argue that the Court's prior decision on the issue of federal preemption, see Docket No. 60, should stand because the "law of the case" doctrine applies because plaintiff has not challenged the Court's prior decision on appeal. (Docket No. 107 at pp. 13-14.)  The "law of the case" doctrine does not apply because an interlocutory decision denying a motion for summary judgment remains open to trial court reconsideration. See Bethlehem Steel Exp. Corp. v Redondo Constr. Corp., 140 F. 3d 319, 321 (1st Cir. 1998) ("[D]enial of summary judgment motions do not constitute the law of the case."); Perez-Ruiz v. Cresop-Guillen, 25 F. 3d 40, 42 (1st Cir. 1994).

claim.  Pursuant to Puerto Rico's Autonomous Municipalities Act ("AMA"), P.R. Laws Ann. tit. 21 §§ 4001 *et seq.*, each municipality has the power to "[e]xercise its legislative and executive powers in any matter of a municipal nature, which will bring about the welfare of the community and its economic, social[,] and cultural development [and] in the protection of the health and safety of the people . . . ."  P.R. Laws Ann. tit. 21 § 4051(o).  Specifically, the AMA "vest[s municipalities] with the powers that are necessary and convenient to . . . [e]stablish solid waste collection services and programs and public sanitation programs in general, and adopt the standards and measures that are necessary for [the improvement] and adequate control and disposal of waste."  P.R. Laws Ann. tit. 21 § 4054 (last alteration in original); see also id. § 4055. Neither party disputes that the structure of the Puerto Rico waste management system involves both state and municipal regulation in the area of non-hazardous solid waste.

The municipalities' power, however, is not unlimited but is instead "subordinate[] to the Constitution of the Commonwealth of Puerto Rico and to its laws."  Id. § 4003; see also id. § 4055 (declaring that municipal regulation of solid waste collection management must be "in harmony with the environmental public policy of the Commonwealth of Puerto Rico"); Plaza Carolina Mall, L.P. v. Mun. of Barceloneta, 91 F. Supp. 3d 267, 288-90 (D.P.R. 2015) (Gelpi, J.) (finding that three municipal ordinances supporting a

municipal contract were invalid because they conflicted with the
Commonwealth's law governing the expenditure of tax revenue).
Because "municipalities possess no inherent powers" but only
exercise those powers "derived" from the state, "'every municipal
ordinance must be in harmony with [state] government law, which
prevails in conflicting situations.'" Liberty Cablevision of P.R.,
Inc. v. Mun. of Caguas, 417 F.3d 216, 221-22 (1st Cir. 2005)
(quoting Lopez v. Mun. de San Juan, 21 P.R. Offic. Trans. 71, 84
(P.R. 1988)); see also Velez v. Mun. de Toa Baja, 9 P.R. Offic.
Trans. 486, 492 (1980) ("[I]n no circumstances can a municipality
prohibit what the Legislature expressly authorizes, or authorize
what the Legislature prohibits; but, following the line of conduct
marked out by the Legislature, it may forbid . . . the commission
of acts of the same character as those prohibited by the
Legislature."). "[E]ven in matters of a municipal nature, the
Municipal Assembly has no authority to intervene when the [Puerto
Rico] Legislative Assembly has preempted that particular field."
Liberty Cablevision, 417 F.3d at 222 (quoting Lopez, 21 P.R. Offic.
Trans. at 84) (finding that municipal law creating access fees was
preempted when the Puerto Rico Legislative Assembly created the
Telecommunication Regulatory Board of Puerto Rico as its sole
franchising, and franchise-fee creating, authority); see also Mun.
of Caguas v. Telecomms. Regulatory Bd. of P.R., No. 08-2048(SEC),
2010 WL 1328974, at *4 (D.P.R. 2010) (Casellas, J.) ("Therefore, if

the Commonwealth has set up a state-wide structure regulated by the Board, the individual municipalities are bound by its decisions."). A municipal ordinance that regulates in the same area as a Commonwealth law, however, will not be preempted "unless it is impossible to harmonize it with the [Commonwealth] law." Lopez, 21 P.R. Offic. Trans. at 72.

The Puerto Rico Supreme Court determines whether a municipal ordinance is "in harmony" with Commonwealth law on a case-by-case basis, P.R. Tourism Co., 179 P.R. Dec. at 585, and considers:

> First, where the state law expressly provides that the state's authority to regulate in a specified area of the law is to be exclusive, there is no doubt that municipal regulation is preempted. [Citations omitted.]

> Second, preemption of a field of regulation may be implied upon an examination of legislative history. [Citations omitted.]

> Third, the pervasiveness of the state regulatory scheme may support a finding of preemption. [Citations omitted.] While the pervasiveness of the state regulatory scheme is not generally sufficient by itself to infer preemption, it is a factor which should be considered as evidence of preemption.

> Fourth, the nature of the regulated subject matter may demand exclusive state regulation to achieve the uniformity necessary to serve the state's purpose or interest.

Lopez, 21 P.R. Offic. Trans. at 84 (quoting People v. Llewellyn, 527 N.W. 2d 902, 905 (Mich. 1977); Velez, 9 P.R. Offic. Trans. at 492-93. The Puerto Rico Supreme Court also considers if the state and municipal tax are activated by the same activity. P.R. Tourism Co., 179 P.R. Dec. at 591-92 (finding that the municipal law was

"contrary to" Puerto Rico Law 272 because both were activated by
the event of a guest occupying a hotel room).

Applying these factors, the Puerto Rico Supreme Court and this
district court have found preemption of municipal ordinances by
laws passed by the Puerto Rico Legislative Assembly.  See, e.g.,
Plaza Carolina, 91 F. Supp. 3d at 290 (invalidating as preempted
three municipal ordinances that violated the Puerto Rico Internal
Revenue Code); Lopez, 21 P.R. Offic. Trans. at 87-89 (holding that
Puerto Rico Law 8 partially preempted a municipal ordinance); P.R.
Tourism Co., 179 P.R. Dec. at 585 (finding a tax pursuant to
municipal law was preempted by a Commonwealth law taxing the same
action); see also Velez 9 P.R. Offic. Trans. at 492-97 (utilizing
the four factors to compare Commonwealth law and municipal law, but
finding the municipal law was not preempted).  The Puerto Rico
Supreme Court has not, however, resolved whether resolutions of
executive agencies carry the same power to preempt as laws passed
by the Puerto Rico Legislative Assembly.[13]  Pursuant to federal law,
the preemptive power of agency actions depends on a myriad of

---

[13] In Lopez v. Mun. of San Juan, the Puerto Rico Supreme Court noted
actions by a Commonwealth planning board that supported the
Commonwealth's preemption of the field of preserving Puerto Rico's
historic zones, but did not address whether the board's actions
alone would have been sufficient to preempt the municipal
ordinance. 21 P.R. Offic. Trans. 71, 85-86 (P.R. 1988) (discussing
in dicta the legal structure that was replaced by Law 8).

factors and is a developing area of jurisprudence.[14]   The Puerto
Rico Uniform Administrative Procedures Act is similar to the
federal Administrative Procedures Act and therefore raises similar
issues regarding the preemptive effect of agency actions.   Compare
P.R. Laws Ann. tit. 3 §§ 2101 *et seq.* (governing Puerto Rico agency
procedures including formal rulemaking and adjudication), with
Administrative Procedures Act, 5 U.S.C. §§ 501 *et seq.*
(establishing procedures for federal formal rulemaking and
administrative adjudicative procedures).   See also Judith Berkan,
La Nueva Ley de Procedimiento Administrativo Uniforme de Puerto
Rico:  Una Comparación con Administrative Procedure Act 106-07
(1989) (comparing these laws).

Here, AES-PR argues that a Puerto Rico agency resolution, EQB
resolution R-15-23-1, and an amended operating permit for

---

[14] Federal statutes and federal agency action promulgated through
formal note-and-comment rulemaking have preemptive effect over
state law. Wyeth v. Levine, 555 U.S. 555, 576 (2009) ("Th[e United
States Supreme] Court has recognized that an agency regulation with
the force of law can pre-empt conflicting state
requirements.").   Less formal agency actions, such as agency
letters and policy statements, however, may not meet the criteria
to be considered federal law for the purpose of preempting state
laws. Holk v. Snapple Beverage Corp., 575 F.3d 329, 342 (3rd Cir.
2009) (finding an agency policy statement and letter did not have
the power to preempt state law); see also Barnhart v. Walton, 535
U.S. 212, 221-22 (2002) (listing factors for courts to consider in
determining the force of law of an agency action); United States v.
Mead Corp., 533 U.S. 218, 234 (2001) (considering deference due to
agency's tax classification); Skidmore v. Swift & Co., 323 U.S.
134, 140 (1944) (agency's interpretation of term did not amount to
law); Perez-Olivo v. Chavez, 394 F.3d 45, 52 n.6 (1st Cir.
2005)(considering deference due to agency program statement).

Ecosystems Landfill preempt the municipal Ordinances. (Docket No. 84-1 at pp. 6-7.)  If these EQB documents, promulgated by a Commonwealth agency, carry the full force of law, then the municipal Ordinances would likely be preempted to the extent that they conflict.  The Court, however, finds that the issue of determining the preemptive power of a Puerto Rico agency resolution has not been resolved by the Puerto Rico Supreme Court.

District courts may certify a question of state law to the state's supreme court when the state issue is determinative and there is no controlling precedent from the state court on the issue. Easthampton Sav. Bank v. Springfield, 736 F.3d 46, 50-51, 53 (1st Cir. 2013) (certifying a question of state law when the state supreme court had not yet interpreted its provisions because balancing the laws competing policy interests was a job best suited for the state government).

Alternatively, "[t]he district courts may decline to exercise supplemental jurisdiction over a claim . . . if[] the claim raises a novel or complex issue of State law." 28 U.S.C. § 1367(c)(1); see also Carver v. Nassau Cty. Interim Fin. Auth., 730 F.3d 150, 154-55 (2nd Cir. 2013) (declining to exercise supplemental jurisdiction when there exists "an unresolved  issue of state law – the interpretation of a poorly drawn statute"); Rodriguez v. Doral Mortg. Corp., 57 F.3d 1168, 1177 (1st Cir. 1995) ("Another factor to be weighed is the clarity of the law that governs a pendent

claim, for a federal court may be wise to forgo the exercise of supplemental jurisdiction when the state law that undergirds the nonfederal claim is of dubious scope and application."); Castellano v. Bd. of Tr. of Police Officers' Variable Supplements Fund, 937 F.2d 752, 758-59 (2nd Cir. 1991) (declining to exercise supplemental jurisdiction over state constitutional law claims challenging pension fund statute because "[i]t would be . . . imprudent for us to determine a state constitutional claim of first impression."). "Where a decision is to be made on the basis of state law . . . the Supreme Court has long shown a strong preference that the controlling interpretation of the relevant [law] be given by state, rather than federal, courts." Allstate Ins. Co. v. Serio, 261 F.3d 143, 150 (2d Cir. 2001).

Here, plaintiff's preemption claim based on the Supremacy Clause of the Commonwealth Constitution is an unresolved state constitutional claim. Deciding the preemptive power of an agency action has wide implications on the Commonwealth government. Deciding whether a certain agency action has preemptive power affects the extent to which the agency functions through formal rulemaking or through informal methods and affects the division of power between the Commonwealth and its autonomous municipalities. Because the Puerto Rico Supreme Court has given little attention to the constitutional issue of the preemptive power of Commonwealth agency actions, and because this issue impacts the actions of

Puerto Rico agencies and municipalities, the Court finds that this is an issue best resolved by the Puerto Rico Supreme Court.

Accordingly, the Court declines to exercise jurisdiction over plaintiff's Puerto Rico preemption claim because it contains a novel and complex issue of state law.  Additionally, as stated above, the Court **AFFIRMS** its previous decision to **DENY** plaintiff summary judgment and to dismiss the federal preemption claim because the municipal Ordinances do not frustrate the purpose of the RCRA, 42 U.S.C. §§ 6901 *et seq.*  Id. at 39.

**D.   Dormant Commerce Clause**

Both parties also move for summary judgment on plaintiff's dormant Commerce Clause claim.

Article I, section 8 of the United States Constitution gives Congress the power to regulate interstate commerce, see U.S. Const. art. I, § 8, cl. 3, and has been interpreted as also containing a negative component called the dormant Commerce Clause.  Walgreen Co. v. Rullan, 405 F.3d 50, 55 (1st Cir. 2005) (citing Laurence H. Tribe, 1 American Constitutional Law 1030 (3d ed. 2000)).  The justification for the dormant Commerce Clause is "that this Nation is a common market in which state lines cannot be made barriers to the free flow of both raw materials and finished goods in response to the economic laws of supply and demand," Hughes v. Alexandria Scrap Corp., 426 U.S. 794, 803 (1976), and its core purpose is "to prevent states and their political subdivisions from promulgating

[economic] protectionist policies." Houlton Citizens' Coal. v. Town of Houlton, 175 F.3d 178, 188 (1st Cir. 1999).

The dormant Commerce Clause doctrine applies equally to Puerto Rico as it does to the states. Walgreen, 405 F. 3d at 55 (citing United Egg Producers v. Dep't of Agric. of P.R., 77 F.3d 567, 569 (1st Cir. 1996)). Additionally, solid waste is an "article of commerce" protected by the dormant Commerce Clause. Fort Gratiot Sanitary Landfill, Inc. v. Mich. Dep't of Nat. Res., 504 U.S. 353, 359 (1992).

## 1.   Legislative Deference and the Dormant Commerce Clause

Defendants contend that this Court should defer wholly to the legislative process and uphold the Ordinances because they were passed after much deliberation and consideration by the municipal governments. (Docket Nos. 88 at pp. 9-13; 107 at pp. 9-12 (citing Ferguson v. Skrupa, 372 U.S. 726, 730 (1963) (noting that legislatures have the right to pass wise and unwise laws alike))). Defendants' contentions do not cover enough ground to fully preclude all judicial review in this area.

The Court is aware of the deference due to state and local legislatures, especially in areas that are traditionally local concerns. See United Haulers Ass'n, Inc. v. Oneida-Herkimer Solid Waste Mgmt. Auth., 550 U.S. 330, 332 (2007) ("The Court is particularly hesitant to interfere here because waste disposal is typically and traditionally a function of local government

exercising its police power."). The Court, however, also notes
that this deference is tempered by the Court's duty to review laws
to ensure that they comply with the United States Constitution.
See S. Pac. Co. v. State of Ariz. *ex rel.* Sullivan, 325 U.S. 761,
769 (1945) ("[W]here Congress has not acted, this Court, and not
the state legislature, is under the commerce clause the final
arbiter of the competing demands of state and national
interests."); see, e.g., United Haulers, 550 U.S. at 338-347
(reviewing municipal ordinances for compliance with the dormant
Commerce Clause); Houlton, 175 F.3d at 178, 184 (reviewing town's
solid waste management ordinance for compliance with the dormant
Commerce Clause, Takings Clause, and Contract Clause and noting
that the dormant Commerce Clause "acts as a brake on the states'
authority to regulate"). Accordingly, the Court reviews the
municipal Ordinances to ensure their compliance with the dormant
Commerce Clause of the United States Constitution.

   **2.   Dormant Commerce Clause Standard**

        Dormant Commerce Clause analysis requires a two-part
inquiry. First, "if a state [or municipal] law has either the
purpose or effect of significantly favoring in-state commercial
interests over out-of-state interests," it is *per se* invalid.
Walgreen, 405 F. 3d at 55-56, 60 (holding that a law requiring new
pharmacies to obtain "certificates of need," but exempting
existing, local businesses from that requirement discriminated in

violation of the dormant Commerce Clause in its effect).  The law
is invalid unless the state or municipality has "no other means to
advance a legitimate local interest." Houlton, 175 F.3d at 185.
"Plaintiffs bear the initial burden of showing discrimination[,] .
. . [and t]he state bears the burden of showing legitimate local
purposes and the lack of non-discriminatory alternatives . . . ."
Family Winemakers of Cal. v. Jenkins, 592 F.3d 1, 9 (1st Cir.
2010).

        Second, a state or municipal law that does not facially
discriminate against out-of-state interests may still be invalid if
"the burden imposed on such commerce is clearly excessive in
relation to the putative local benefits." Industria y
Distribution de Alimentos v. Trailer Bridge, 797 F.3d 141, 146
(1st Cir. 2015) (quoting Pike v. Bruce Church, Inc., 397 U.S. 137,
142 (1970)).  For example, The United States Supreme Court found
that a law that limited the length of trains was a substantial
burden on interstate commerce because "breaking up and remaking
long trains upon entering and leaving the state in order to comply
with the law[] delays the traffic" and increases operating costs.
S. Pac. Co., 325 U.S. at 761.

**3.   Step 1:  Facial or Effect-Based Discrimination**

        Regarding the first step, facial or effect-based
discrimination, plaintiff argues that the Ordinances violate the
dormant Commerce Clause by favoring local substitutes to AES-PR's

CCRs, which are created using foreign, imported coal. (Docket Nos. 84-1 at pp. 7-8; 108 at pp. 16-18; 115 at pp. 10-13.) Defendants contend that because the Ordinances ban all CCRs, without consideration or mention of their origin, the Ordinances regulate even-handedly and thus, do not discriminate on their face. (Docket Nos. 88 at pp. 14-15; 107 at pp. 5-7.)

In United Haulers, the United States Supreme Court examined municipal ordinances in New York that required all solid waste to be processed by a state-owned facility. 550 U.S. at 334. The Supreme Court held that the counties' ordinances "treat in-state private business interests exactly the same as out-of-state ones, [and therefore,] do not 'discriminate against interstate commerce' for purposes of the dormant Commerce Clause." Id. at 345. In reaching this decision, the Supreme Court considered the text of the ordinances, which favored local government but treated all private industry equally. Id. at 334, 337; see also Walgreen, 405 F.3d at 55, 60 (finding a Puerto Rico law facially neutral when its language required all new pharmacies to obtain a certificate regardless of their origin). The First Circuit Court of Appeals has also found that statutes regulate evenhandedly when no product in the affected market was manufactured domestically because such statutes do not create an effect of benefitting local commerce. Used Tire Int'l, Inc. v. Diaz-Saldana, 155 F.3d 1, 5 (1st Cir. 1998) (citing Pike, 397 U.S. at 142).

Courts have also considered ordinances that deny competitors access to a local market to be discriminatory.  C & A Carbone, Inc. v. Town of Clarkstown, 511 U.S. 383, 386 (1994) (finding that town flow-control ordinance facially discriminated by forcing all waste within its borders to be processed through its designated private transfer station); cf. Houlton, 175 F.3d at 188 ("It follows, therefore, that if local legislation leaves all comers with equal access to the local market, it does not offend the dormant Commerce Clause.").  "A state law is discriminatory in effect when, in practice, it affects similarly situated entities in a market by imposing disproportionate burdens on out-of-state interests and conferring advantages upon in-state interests." Family Winemakers, 592 F.3d at 10.

Here, the Ordinances do not facially discriminate because neither the text nor the effect of the Ordinances distinguishes between in-state and out-of-state products, but rather the Ordinances ban all uses of CCRs that involve depositing them on the ground.  (Docket Nos. 86-1 at p. 9; 86-2 at p. 8.)  The Peñuelas Ordinance bans ashes from any "burning of coal[] in energy generating plants," (Docket No. 86-2 at p. 8), and the Humacao Ordinance bans "[a]ny kind of use of the ash derived from coal combustion in electric power generating plants or any other industrial or commercial activity," (Docket No. 86-1 at p. 9). Like the neutral language of the statute in United Haulers, 550

U.S. at 334, the Humacao and Peñuelas Ordinances regulate evenhandedly because their texts do not distinguish based on the product's origin.

Additionally, the Ordinances here do not deny access to local markets because they place no limitations on coal trade and still allow CCRs to be bought, sold, and transported in the municipalities so long as they are not deposited on the ground in the process. See C & A Carbone, 511 U.S. at 386. The Humacao and Peñuelas Ordinances do not "attempt[] to hoard solid waste . . . [or] other commodities for processing by local, as opposed to out-of-state, interests," see Houlton, 175 F.3d at 185, but rather, ban deposit of all CCRs in the ground, thereby eliminating the market for uses of CCRs that involve deposit in the ground for foreign and domestic companies alike. Upon review of the Ordinances' text and effect, plaintiff's arguments are left in ashes. Accordingly, because the Ordinances are not facially discriminatory or discriminatory in their effect, the Court need not consider whether the Ordinances are the only "means to accomplish a legitimate local interest."[15]

---

[15] If the Court had reached this second step, it would consider that the municipalities have a "strong local interest in efficient and effective waste management." See Houlton, 175 F.3d at 189.

**4.    Step 2:  _Pike_ Balancing Test**

   **a.    Burden on Interstate Commerce**

Plaintiff argues that the Humacao and Peñuelas Ordinances discriminate against a foreign product because all CCRs are created from burning foreign coal and no coal mines exist in Puerto Rico.  (Docket No. 108 at pp. 13-15).  In support of this argument, plaintiff cites _Bacchus Imps. v. Dias_, in which the United States Supreme Court found that the ordinance at issue was invalid because it discriminated against foreign commerce by creating a tax exemption for a brandy made from a root indigenous to Hawaii.  468 U.S. 263, 270-71 (1984).  Plaintiff compares the fact that the root in _Bacchus_ was grown only in Hawaii with the fact that coal is not mined in Puerto Rico.  Plaintiff, however, focuses on the wrong asset.  In _Bacchus_, the okolehao brandy derived from the root was also made locally.  _Id._ at 265.  The tax was on the brandy itself, not on the root used to make it.  _Id._ at 271 (finding that "the effect of the exemption is clearly discriminatory, in that it applies only to locally produced beverages").  Additionally, in solid waste management cases, courts focus on the origin of the item of commerce, the solid waste, not on the origin of the individual items that compose the waste.  _See generally_ _United Haulers_, 550 U.S. 330; _Houlton_, 175 F.3d 178. Here, the Ordinances focus on CCRs, which are produced domestically at the Guayama plant, not on the imported coal used to create CCRs.

Whether focusing on coal or CCRs, the burden of the Ordinances on interstate commerce is slight.  Focusing on CCRs, which are produced in Guayama, Puerto Rico, (Docket No. 85 at pp. 1-2), the Ordinances do not burden interstate commerce because the AES-PR CCRs are both produced and sold in Puerto Rico.  If the Ordinances did create a burden on CCRs, it would be slight because the Ordinances limit only one of several uses for CCRs.  CCRs may still be bought, sold, transported, or used in any way that does not require depositing them on the ground.

Focusing on coal, the Ordinances make no mention of coal and place no direct restrictions on transport or use of coal. Plaintiff argues, and supports with expert testimony, that the Ordinances' prohibition on the disposal and use of CCRs, will cause plaintiff to incur large costs to ship CCRs to the continental United States for disposal.  (Docket Nos. 84-1 at p. 8; 108 at p. 19; 115 at p. 10.)  Because the burden aspect of dormant Commerce Clause analysis pursuant to the Pike balancing test is focused on the burden to interstate commerce, and because the only interstate product mentioned by plaintiff is foreign coal, plaintiff must connect the burden of the increased cost of disposal or use of CCRs to the import of foreign coal.  While plaintiff's argument connecting the two is hazy at best, the Court reads plaintiff's argument as implying that the additional shipping costs to dispose of CCRs would impact the interstate market for coal by

increasing the cost of the overall process of importing foreign
coal, burning it to produce electricity, and disposing of its
byproduct, CCRs.

     This argument fails in two regards.  First, AES-PR
has not demonstrated how the increased cost of disposing of CCRs
from coal-based electricity generation will impact its purchase of
coal, production of electricity, or production of CCRs – let alone
the overall markets for these goods.  Perfect Puppy, Inc. v. City
of E. Providence, 98 F. Supp. 3d 408, 418 (D.R.I. 2015) ("Even
having 'devastating economic consequences on a particular
interstate firm' does not constitute a burden on interstate
commerce under the Pike analysis." (quoting Pharm. Research Mfrs.
v. Concannon, 249 F.3d 66, 84 (1st Cir. 2001)).

     Second, plaintiff's argument fails because any
increase in price due to the Ordinances will likely be felt by
Puerto Rico residents, and thus will be a local burden, not a
burden on "interests outside the state."  See United Haulers, 550
U.S. at 345; see also Grant's Dairy v. Comm'r of Maine Dep't of
Agric., Food, and Rural Res., 232 F.3d 8, 21-22 (1st Cir. 2000)
(finding that the burden of the law fell on Maine handlers, who
passed it on to Maine consumers, and therefore the law dealt with
intrastate commerce, an area not regulated by the dormant Commerce
Clause).  In United Haulers, the Supreme Court found that the
burden of the ordinances – "more expensive trash removal – will

likely fall upon the very people who voted for the laws," the local citizens and businesses, and thus, any harm created by the ordinances was a burden on local interests and not out-of-state interests. 550 U.S. at 345. The Supreme Court expressed that any discriminatory effect of the ordinances could be addressed through the political process and should not be remedied through the Court's review on a dormant Commerce Clause claim. Id.; see Grant's Dairy, 232 F.3d at 22 ("Th[e consumers'] lament should be addressed to the Maine legislature, not to the federal courts."). Similarly here, the increased cost of the coal burning and disposal process will be passed on to Puerto Rico residents in the form of higher electricity prices, because electricity is a largely inelastic good, or higher waste disposal fees. Thus, the burden will be on local residents and businesses, not on interstate commerce.

Therefore, whether focusing on coal or CCRs, the burden of the Humacao and Peñuelas Ordinances on interstate commerce is either nonexistent or slight.

**b.   Benefit to Putative Local Interest**

Defendants assert that the benefit of the Ordinances is to protect human health and the environment. (Docket Nos. 88 at p. 16; 107 at p. 9.) The affidavits, interrogatory answers, and depositions that defendants have submitted in support of their motion for summary judgment establish that the municipalities

considered the health and environmental implications of CCRs in adopting the Ordinances. (Docket No. 89 at pp. 3-4.) Defendants have not, through documents supporting their motion for summary judgment, proven that CCRs are harmful to human health or the environment. "[U]nder Pike, [however,] it is the *putative* local benefits that matter. It matters not whether these benefits actually come into being at the end of the day." Pharm. Care Mgmt. Ass'n v. Rowe, 429 F.3d 294, 313 (1st Cir. 2005); see also United Haulers, 550 U.S. at 346 (noting that the standards to be a benefit under the Pike test are lower than to be a legitimate local interest); Perfect Puppy, 98 F. Supp. 3d at 417 (stating that a putative benefit need not even be mentioned in the text of the law to be considered for Pike balancing); Zogenix, Inc. v. Baker, Civ. No. 14-11689-RWZ, 2015 WL 1206354, at *8 (D. Mass. Mar. 17, 2015) (finding that even though party failed to factually support their claim that the drug was dangerous, the putative benefit asserted by the legislature – promoting health and safety – was a sufficient benefit to outweigh burden).

Here, the putative local benefits, human health and environmental protection, are established in the Ordinances' legislative findings. See Docket Nos. 86-1 at p. 9; 86-2 at p. 8; see also Houlton, 175 F.3d at 191 (finding that the legislative purpose of protecting public health and safety, which was stated in the ordinance's preamble, was sufficient to establish a legitimate

public purpose).  Additionally, the First Circuit Court of Appeals previously found that there is a "mounting problem of solid waste disposal" in Puerto Rico and disposal of that solid waste[16] creates "health and environmental consequences."  Used Tire, 155 F.3d at 2.

The extent of the benefit to human health and the environment from banning CCRs is debated by the parties, but that debate is immaterial because the extent of the very slight burden that the Ordinances place on interstate commerce in the markets for coal or CCRs cannot "clearly exceed" the Ordinances' putative benefits of promoting human health and environmental protection.

Thus, because the Ordinances do not discriminate on their face or in their effect and because the Ordinances are not discriminatory pursuant to the Pike balancing test, the Court **GRANTS** defendants' motion for summary judgment on plaintiff's dormant Commerce Clause claim.

**E.    Contract Clause**

Defendants argue, pursuant to the Contract Clause, that the Court should defer to the legislative branch and leave undisturbed the Humacao and Peñuelas Ordinances.  (Docket No. 88 at pp. 9-13.)

The Contract Clause of the United States Constitution prohibits any state from passing a "Law impairing the Obligations of Contracts."  U.S. Const. art. 1, § 10, cl. 1.  "The Contract Clause protects individuals and legal entities who have freely

---

[16] CCRs are non-hazardous solid waste.  (Docket No. 85 at pp. 3-4.)

entered into contracts from legislative action that impairs the
obligations under those contracts." Universal Ins. Co. v. Dep't of
Justice, 866 F. Supp. 2d 49, 67 (D.P.R. 2012) (Besosa, J.).
"Despite its unequivocal language, [the Contract Clause] does not
make unlawful every state law that conflicts with any contract . .
. . A Court's task is to reconcile the strictures of the Contract
Clause with the essential attributes of sovereign power necessarily
reserved by the States to safeguard welfare of their citizens."
United Auto., Aerospace, Agric. Implement Workers of Am. Int'l
Union v. Fortuño, 633 F.3d 37, 41 (1st Cir. 2011) [hereinafter UAW]
(internal citations and quotation marks omitted).

    The court's Contract Clause analysis is a two-part inquiry.
Parella v. Ret. Bd. of the R.I. Emps.' Ret. Sys., 173 F.3d 46, 59
(1st Cir. 1999). The court asks (1) "whether the state law has .
. . operated as a substantial impairment of a contractual
relationship" and if so, (2) "whether the impairment was
'reasonable and necessary to serve an important government
purpose.'" UAW, 633 F.3d at 41; see also Houlton, 175 F.3d at 191
("[E]ven a state law that creates a substantial impairment does not
transgress the Contract Clause as long as it is appropriate for,
and necessary to, the accomplishment of a legitimate public
purpose.").

    To constitute a substantial impairment pursuant to the first
inquiry, three elements must be present:  (a) a contractual

relationship must exist, (b) the law must impair that relationship, and (c) the impairment must be substantial.  Houlton, 175 F.3d at 191 (citing Gen. Motors Corp. v. Romein, 503 U.S. 181, 186 (1991)). In evaluating the substantiality of an impairment, courts consider the parties expectations in entering into the contract.  UAW, 633 F.3d at 46 ("[P]arties in a highly regulated industry have a diminished expectation that their contracts will not be impaired by the government.").

Pursuant to the second inquiry, courts first identify a legitimate public purpose and then assess whether the government's actions in achieving that purpose were reasonable.  Houlton, 175 F.3d at 191.  When reviewing a contract between two private parties, where there is a minimal chance that the state is "using its regulatory power to profiteer or otherwise serve its own pecuniary interests," Houlton, 175 F.3d at 191, the court "may defer to the legislature's judgment' and need not assess the reasonableness and necessity of the impairing regulation." Universal Ins., 866 F. Supp. 2d at 69 (internal quotations omitted).  Courts also determine the parties' main purpose for entering into the contract and whether the law "totally eliminated" or "merely modified" the parties' ability to accomplish that main purpose.  Franklin Cal. Tax-Free Tr. v. P.R., 85 F. Supp. 3d 577, 607 (D.P.R. 2015) (Besosa, J.).

Here, plaintiff argues that the PPA with PREPA grants it a contractual right to use and dispose of CCRs and that the Humacao and Peñuelas Ordinances substantially impair that contractual right by prohibiting use and disposal of CCRs which results in increased costs to AES-PR from transporting CCRs to the continental United States for use and disposal.  (Docket No. 108 at pp. 23-25.) Plaintiff then argues that any substantial impairment is unreasonable and unnecessary because it does not serve the asserted purpose of protecting human health and the environment because CCRs used or deposited in a Subtitle D-compliant landfill do not pose a risk to human health or the environment.  Id. at p. 25 n.13.

Neither party contests that the PPA creates contractual rights between PREPA and AES-PR.  The parties do disagree, however, on the extent of those contractual rights and whether the Ordinances impair them.  (Docket Nos. 88 at pp. 18-20; 108 at pp. 23-25.)

The Supreme Court in Texaco, Inc. v. Short found that a "statute cannot be said to impair a contract that did not exist at the time of its enactment."  454 U.S. 516, 517 (1982); see also Me. Educ. Ass'n Benefits Tr. v. Cioppa, 842 F. Supp. 2d 373, 384 (D. Me. 2012) (holding a law enacted in June 2011 did not substantially impair an existing contractual relationship when the contract was signed in August 2011 and was effective from July 2011 because no contractual rights existed at the time that the law was passed.)

Here, the Humacao and Peñuelas Ordinances were passed in 2014 and 2013 respectively.  (Docket Nos. 86-1 at p. 10, 86-2 at p. 10.) Although the PPA was originally signed in 1994, the second amendment, which addresses the issue of CCRs, was not added until July 17, 2015.  (Docket No. 109-5 at pp. 169, 171-72 (replacing the existing section 6.6 of the PPA with language that specifically addresses the use and disposal of CCRs).)  Prior to this amendment, PPA section 6.6 provided:

> [T]hat any combustion waste or by-product produced by the operation of the Facility, which cannot be used for beneficial commercial uses,[17] will not be stored anywhere in the Commonwealth of Puerto Rico for a period in excess of one hundred eighty (180) days and that it will not be disposed anywhere in the Commonwealth of Puerto Rico or its neighboring waters.

Id. at 33.  Thus, at the time that the Ordinances were enacted, the PPA did not create a contractual right in AES-PR to use or dispose of CCRs, but rather, prohibited AES-PR from disposing of CCRs in Puerto Rico.  Because, at the time that the Ordinances were passed, AES-PR had no contractual right to dispose of or use CCRs in Puerto Rico pursuant to the PPA, the Ordinances did not substantially impair any existing contractual right in violation of the Contract Clause.  Because the Court finds that the Ordinances do not impair any contractual right under the PPA, the Court need not analyze the

---

[17] EQB does not classify disposal or use as daily cover as beneficial use.  (Docket No. 86-8 at p. 7.)

substantiality of the impairment[18] or the reasonableness of the government action.[19]   Accordingly, the Court **GRANTS** summary judgment to defendants on plaintiff's federal Contract Clause claims.

**F.   Procedural Due Process Clause**

AES-PR asserts that its PPA with PREPA grants it a property interest to use or dispose of CCRs in Puerto Rico and that the Ordinances deprive it of this property interest in violation of the Due Process Clause.   (Docket No. 108 at pp. 25-28.)   The Due Process Clause provides that "[n]o person shall be . . . deprived of life, liberty, or property, without due process of law."   U.S.

---

[18] Had the Court reached analysis of this prong, it would have noted that the heavily regulated nature of the waste collection and disposal industry puts companies functioning in that industry on notice that additional regulation is likely and may interfere with their contracts.   Houlton, 175 F.3d at 190 (finding that "the waste collection and disposal industry is subject to fairly pervasive regulation").

[19] If the Court had reached this prong, it would have considered the fact that the municipalities are not parties to the PPA and thus not likely seeking to "profiteer" by passing the Ordinances.   See Houlton, 175 F.3d at 191.   The Court would have also considered that the asserted purpose of protecting human health and the environment is a legitimate public purpose.   Id. (finding that public health, safety, and economies of scales for the citizens are all legitimate public purposes).   Finally, the Court would have considered that the main purpose of the PPA is for AES-PR to produce electricity and supply it to PREPA, not the use or disposal of CCRs, and that while accomplishing the purpose of producing electricity is likely more expensive to perform after passage of the Ordinances, it is not impeded.   Perfect Puppy, 98 F. Supp. 3d at 424 (finding that any impact that the town's ordinance had on the parties' lease contract "consist[ed] of 'diminished profitability and therefore diminished ability to keep up obligations,' which does not constitute a Contract Clause violation" (quoting S. Terminal Corp. v. E.P.A., 504 F.2d 646, 680 (1st Cir. 1974))).

Const. amend. 5; see also U.S. Const amend. 14 § 1 (establishing a due process requirement for the states).   "Courts approach procedural due process claims in two major steps:  (1) the existence of an interest protected by the due process clauses [i.e., life, liberty, or property]; and (2) the inadequacy of the procedures provided."  32 Charles Alan Wright & Charles H Koch, Jr., Federal Practice & Procedure § 8126 (1st ed. 2016).  "The first inquiry in every due process challenge is whether the plaintiff has been deprived of a protected interest in 'property' or 'liberty.' Only after finding the deprivation of a protected interest do we look to see if the State's procedures comport with due process."  Am. Mfrs. Mut. Ins. Co. v. Sullivan, 526 U.S. 40, 59 (1999) (internal citations omitted).

Here, the PPA does not create a property right for AES-PR to dispose of its CCRs because PREPA's enabling statute,[20] the Puerto Rico Electric Power Authority Act ("PREPA Act"), does not grant it power to regulate waste disposal.  See generally P.R. Laws Ann. tit. 22 §§ 191 et seq.  Instead, the Puerto Rico Legislative Assembly has granted this power to the Solid Waste Authority, see P.R. Laws Ann. tit. 12 § 1305, the autonomous municipalities of Puerto Rico, see id. § 4054(a), and the EQB, see id. tit. 12 § 8002b.  Thus, because the text of the PREPA Act unambiguously

---

[20] An enabling statute is "a congressional statute conferring powers on an executive agency to carry out various delegated tasks." Enabling Statute, Black's Law Dictionary (10th ed. 2014).

refrains from granting PREPA authority in the area of waste management, any contractual grant of such power is invalid because it falls outside of the scope of PREPA's enabling statute. See Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc., 467 U.S. 837 (1984) (citing United States v. Shimer, 367 U.S. 374, 382-83 (1961)) (noting that deference should not be given to agency's actions that depart from the reasonable interpretation of the powers that Congress conferred upon the agency).

The text of the PPA, as amended, supports this conclusion by indicating that any use or disposal of CCRs in Puerto Rico is contingent upon "authori[zation] by any applicable environmental . . . resolution . . . governing the handling, storage, transportation, disposal and use of any CCR and/or . . . Agremax." (Docket No. 109-5 at p. 172.)  By indicating that additional authorization is required, the PPA acknowledges that it is not authorizing use or disposal of CCRs, but instead that PREPA supports any use or disposal that is authorized by the proper authority, here the EQB.

Because the PPA does not grant AES-PR a property interest to use or dispose of CCRs in Puerto Rico, the Court need not reach the second step of the Due Process Clause analysis and thus, need not consider the process due or the process actually afforded.  The lack of property interest is sufficient to defeat AES-PR's Due

Process Clause claim.   Accordingly, the Court **GRANTS** summary judgment to defendants on AES-PR's Due Process Clause claim.

## G.   Commonwealth Claims

Having argued for dismissal of all of the federal claims, defendants argue that the Court should dismiss the remaining Commonwealth claims because the Puerto Rico Supreme Court is the proper court to hear claims regarding the Puerto Rico Constitution and Commonwealth preemption of municipal laws.   (Docket No. 88 at pp. 22-25.)   Plaintiff contends that even if no federal claims remain, the advanced stage of the litigation supports the Court exercising supplemental jurisdiction over the Puerto Rico law claims.   (Docket No. 108 at pp. 28-31.)

"[I]n any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy . . . ." 28 U.S.C. § 1367(a).   The district court has discretion in exercising supplemental jurisdiction and may decline to do so if "the claim raises a novel or complex issue of State law" or "the district court has dismissed all claims over which it has original jurisdiction."   28 U.S.C. § 1367(c).   "[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors . . . will point toward declining to exercise jurisdiction over the remaining

state-law claims." _Carnegie-Mellon Univ. v. Cohill_, 484 U.S. 343, 350 n. 7 (1988) _superseded on other grounds by statute as recognized in_ _Fent v. Okla. Water Res. Bd._, 235 F.3d 553, 557 (10th Cir. 2000); _see also_ _Rivera-Diaz v. Humana Ins. of P.R., Inc._, 748 F.3d 387, 392 (1st Cir. 2014) (upholding district court's decision not to exercise supplemental jurisdiction when all federal-law claims were dismissed); _Lucas v. Twp. of Bethel_, 137 Fed. App'x 450, 452 (3rd Cir. 2005) ("[W]hen original jurisdiction claims are dismissed before trial, the district court must decline to exercise jurisdiction over pendent state claims unless there is an affirmative justification for doing so."); _Ticket Center, Inc. v. Banco Popular de P.R._, 613 F. Supp. 2d 162, 180-81 (D.P.R. 2008) (McGiverin, J.) (declining to exercise supplemental jurisdiction over remaining Commonwealth law claims after granting summary judgment on all federal claims).

In deciding to exercise supplemental jurisdiction, district courts consider concerns of fairness, judicial economy, convenience, and comity. _Redondo Constr. Corp. v. Izquierdo_, 662 F.3d 42, 49 (1st Cir. 2011) (reviewing the district court's consideration of these factors and giving great credit to the length of the federal litigation and the proximity to trial).

Plaintiff argues that it would be unfair, inconvenient, and a waste of judicial resources to start anew at the state level when the parties here have already conducted discovery, obtained expert

reports, filed for summary judgment, and prepared for trial. (Docket No. 108 at pp. 29-30.) Plaintiff compares this litigation to the litigation in Redondo, where the First Circuit Court of Appeals found that the district court should have exercised supplemental jurisdiction over Commonwealth law claims because the "[t]he litigation had matured well beyond its nascent stages, discovery had closed, the summary judgment record was complete, the federal and state claims were interconnected, and powerful interests in both judicial economy and fairness tugged in favor of retaining jurisdiction". 662 F.3d at 49. In Redondo, the First Circuit Court of Appeals also considered the cost of translating documents and other discovery items from English to Spanish for use in the Commonwealth courts. 662 F.3d at 49-50. Finally, in Redondo, the First Circuit Court of Appeals noted that considerations of comity did not offset the factors weighing in favor of exercising supplemental jurisdiction because "[f]ederal courts in Puerto Rico exercising diversity jurisdiction routinely apply the well-established principles of contract law" at issue in that case. Id. at 50.

Here, as in Redondo, it would be inconvenient and unfair to require the parties to start anew in Commonwealth court because discovery has closed, several motions for summary judgment have been filed, and the parties have filed a proposed pretrial order. See Docket Nos. 84, 88, 127. An advanced stage of litigation and

need to translate documents, however, does not require the court to exercise supplemental jurisdiction.  See, e.g., Ticket Center, 613 F. Supp. 2d at 180-81 (dismissing federal claims on motion for summary judgment and declining to exercise supplemental jurisdiction even though any subsequent Commonwealth claim would be litigated in Spanish).

Unlike in Redondo, less judicial resources are wasted here because several of the Commonwealth law issues presented are already being litigated in related cases in Commonwealth courts. See, e.g., Mun. of Peñuelas v. Ecosystems, Inc., No. J PE2014-0457, 2015 WL 1565878, at *2 (P.R. Cir. Feb. 25, 2015) (analyzing *ultra vires* claims and whether Peñuelas satisfied Puerto Rico Due Process requirements in passing Ordinance 13); Docket No. 132-1 (Mun. of Peñuelas v. Peñuelas Valley Landfill, Inc., No. J PE2015-0415 (P.R. Court of First Instance - Ponce Superior Division, June 24, 2016) (ruling on issues of preemption and whether Peñuelas acted *ultra vires* in passing Ordinance 13)); see also Lucas, 137 Fed. App'x at 453 (finding that declining to exercise supplemental jurisdiction promoted judicial economy when related state court cases existed).  Additionally, several of the issues of Commonwealth law, specifically the Puerto Rico *ultra vires*, Contract Clause, and Due Process Clause claims, have not yet been fully briefed or argued to this Court.

Also, unlike <u>Redondo</u>, the issue of comity weighs heavily in favor of dismissing the claims to the Commonwealth courts because the principles of preemption pursuant to the Puerto Rico constitution are not well-established principles of law.  As discussed above, the preemptive power of a Puerto Rico agency resolution over a municipal ordinance is a developing issue of administrative law best addressed by the Puerto Rico Supreme Court. <u>Supra</u> Part II.C.

Therefore, even though the advanced stage of the litigation and the costs of translating documents into English weigh in favor of the Court exercising supplemental jurisdiction, those concerns are minimized by the litigation of similar issues in related cases in Commonwealth courts and offset by the comity concerns presented by the unsettled nature of the law relating to the Puerto Rico preemption claim.  Accordingly, the Court **DECLINES** to exercise supplemental jurisdiction over AES-PR's Commonwealth claims.

### III.   CONCLUSION

For the above reasons, the Court **GRANTS** AES-PR's motion for judicial notice, (Docket No. 86), **GRANTS IN PART** and **DENIES IN PART** defendants' motion for judicial notice, (Docket No. 90), **DENIES** AES-PR's motion to strike, (Docket No. 111), and **DENIES** AES-PR's motion for partial summary judgment, (Docket No. 84).  The Court **GRANTS** defendants' motion for summary judgment, (Docket No. 88), on all federal claims.  Accordingly, plaintiff AES-PR's federal law

claims are **DISMISSED WITH PREJUDICE** and its Puerto Rico law claims
are **DISMISSED WITHOUT PREJUDICE.**

Judgment shall be entered according to this order and the
Court's prior order at Docket No. 60.

**IT IS SO ORDERED.**

San Juan, Puerto Rico, July 27, 2016.

                                   s/ Francisco A. Besosa
                                   FRANCISCO A. BESOSA
                                   UNITED STATES DISTRICT JUDGE